**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EARTH ISLAND INSTITUTE and SEQUOIA FORESTKEEPER,** | **1:17-cv-01320-LJO-MJS** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 10)** |
| **v.** | |
| **KEVIN ELLIOTT, in his official capacity as Forest Supervisor of the Sequoia National Forest, et al.,** | |
| **Defendants.** | |

## I. <u>INTRODUCTION</u>

Before the Court is Earth Island Institute and Sequoia ForestKeeper's ("Plaintiffs") motion for a preliminary injunction. ECF No. 10. Federal Defendants Kevin Elliott, in his official capacity as Forest Supervisor of the Sequoia National Forest, and the United States Forest Service ("USFS") (together, "Federal Defendants") and Defendant-Intervenor Sierra Forest Products both opposed Plaintiffs' motion, ECF Nos. 21 and 22, and Plaintiffs replied, ECF No. 24. For the reasons stated below, Plaintiffs' motion for a preliminary injunction is DENIED.

## II. <u>FACTUAL BACKGROUND</u>

At issue is a USFS fire salvage restoration project proposed and approved by the USFS to treat a strip of land along an area of roadways affected by the Cedar Fire. The Cedar Fire began on August 16, 2016, and burned for three weeks over 29,000 acres of mixed conifer and white fir forest, most of which were in the Sequoia National Forest. ECF No. 10-9, Preliminary Injunction Record ("PIR") 1393, PIR

1936.[1]  The USFS is working to abate the hazards associated with this burned area of forest, including through the "Bull Run" project, which is planned to involve felling dead and dying trees along 50.2 miles of road along the east side of the Greenhorn Mountains, outside the Giant Sequoia National Monument.  This project would treat up to 3,500 of the 29,000 acres in the Cedar Fire burn area.  ECF No. 22-1, Declaration of Kevin B. Elliott ("Elliott Decl.") ¶ 7.  On October 31, 2016, the USFS announced a single project to remove hazardous trees along roads on both the eastern and western sides of the Greenhorn Mountains in the Giant Sequoia National Monument.  PIR 1, 14.  The USFS later announced that it intended to treat the eastern and western components as two separate projects, with separate Environmental Assessments ("EA") prepared for each.  PIR 14.  The USFS then confirmed that it would undertake the Bull Run project separately from the "Spear Creek" project on the western side of the Greenhorn Mountains.  PIR 20; PIR 932.

Much of the USFS's reasoning regarding regulatory issues related to the Bull Run project is set forth in a Revised Decision Memo, which outlines the proposed project as one designed to "mitigate the hazards to public safety posed by the dead and dying trees along approximately 50.2 miles of road in the project area," which consists of approximately 3,500 acres on the border of Tulare and Kern Counties, roughly 30 miles southeast of Porterville, CA.  ECF No. 22-2, Revised Decision Mem. at 1.  The project will abate hazard trees within 300 feet of each side of the road.  Hazard trees will be identified using Forest Service guidelines and will be felled if they "could potentially strike within the road's clearing width, or could roll or slide into the clearing after they fall."  *Id*. at 2.  Dead, dying, or damaged trees unlikely to fall into the road will not be felled unless they present a hazard to workers, and the memo is clear that the project "is not authorizing a 'clearcut' within 300 feet of road edges."  *Id*. at 3.  Felled trees will be removed if they "represent an obstruction to use and maintenance within the road's clearing width," if leaving the tree in place will increase fuel loading, or if removal is needed for the reforestation

---

[1] Plaintiffs' Preliminary Injunction Record was filed in two parts, ECF No. 10-8 and 10-9.

process. *Id.* Felled logs may be chipped or burned, and logs "considered to have commercial value may be sold as saw timber, cull logs, firewood, chips, posts, and poles," and branches and limbs may also be sold. *Id.* Some logs "will be left in place for habitat" and to meet the standard under the 2004 Sierra Nevada Forest Plan Amendment for down woody material retention. *Id.* Finally, the project will include activities to restore organic ground cover and to reforest the habitat, including planting seedlings, scattering seeds, and increasing organic ground cover by scattering limbs, branches, and chips. *Id.*

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, the USFS undertook an analysis of the Bull Run project's potential effects on wildlife in an 86-page Biological Evaluation, ECF No. 22-3 ("BE"), and a 30-page Biological Assessment, ECF No. 22-4 ("BA"). It also consulted with the U.S. Fish and Wildlife Service ("FWS"), which produced a 22-page Biological Opinion concerning the potential impacts of the project on species listed under the Endangered Species Act ("ESA"). ECF No. 22-5 ("BiOp"). Under NEPA, proposed agency action need not be subject to further analysis through an Environmental Impact Statement ("EIS") or EA "if there are no extraordinary circumstances related to the proposed action" and the action fits into a categorical exclusion ("CE"), a category of action that the agency has determined does not have significant effects on the environment. 36 C.F.R. § 220.6. The USFS determined that the project fit into three CEs, for road repair and maintenance (CE-4), timber stand and/or wildlife habitat improvement activities (CE-6), and post-fire rehabilitation activities (CE-11). Revised Decision Mem. at 3-4; 36 C.F.R. § 220.6(d)(4), (e)(6), (e)(11).

The USFS also determined that there were no extraordinary circumstances related to the project that would trigger further review through an EIS or EA pursuant to NEPA. Before approving a project under an agency-adopted CE, an agency must examine whether a particular project presents "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. The agency is directed to examine "the degree of the potential effect of a

proposed action on" things such as "Federally listed threatened or endangered species" or "Forest Service sensitive species."  36 C.F.R. § 220.6(b).  The USFS did not find that the Bull Run project would have significant adverse impacts to the mountain yellow-legged frog ("MYLF"), Pacific fisher, or California spotted owl ("CSO") that would require the project to undergo further NEPA analysis.

The MYLF is listed as endangered under the ESA.  PIR 1366.  The project area contains no documented MYLF populations and no critical habitat, BA 19, and all three MYLF populations known to exist in the Sequoia National Forest are more than 20 miles away, BA 12.  No recent comprehensive surveys have been conducted in the project area, however, and because of this lack of certainty, the FWS concluded that the project "may affect and [is] likely to adversely affect" MYLF in the area because of "an inability to guarantee that no take to the species or their habitat would occur with implementation of the project."  BiOp 20.  The FWS also concluded, however, that if MYLF populations do exist in the project area, "population numbers are quite likely very low due to the habitat loss from recent fires and the last four years of intense drought conditions that have eliminated aquatic habitat from many of the streams and meadows within the action area," though last winter's high snowfall was expected to return the aquatic conditions to pre-drought levels.  BiOp 12.  Despite 30 "site-specific measures" designed to minimize the risks associated with the project, BA 27-30; BiOp 4-7, the USFS could not guarantee that no take would occur, BA 20.  If more than the expected 197 acres are affected, or if "more than one dead or injured mountain yellow-legged frog adult, juvenile, tadpole, or egg mass is detected as a result of the proposed project," FWS's BiOp required USFS to halt the project and reinitiate formal consultation with FWS.  BiOp 15.  FWS concluded that "the prospects for these populations to recover and contribute to the overall recovery of the species are high," despite the potential loss of individual frogs as a result of the project.  BiOp 15-16.

The Pacific fisher is a sensitive species but is not endangered or threatened.  BE 5.  There are "no [fisher] den sites in the project analysis area," BE 48, and research in the Sierra National Forest has shown that fishers do not use "high severity burn areas" at least in the immediate aftermath of a fire,

though there is "some evidence of limited foraging occurring along the burn edge." BE 54. Fishers appear to favor "landscapes with more contiguous, unfrequented forests and less human activity" and are negatively associated with road density. BE 47. The existence of roads has already affected the canopy cover in the area, BE 52, and the project "focuses its efforts to encompass areas of highest burn severity where low canopy cover and structural attributes needed for resting and denning activity are no longer present." BE 54.

Plaintiffs submitted supplemental comments concerning the potential effects on fisher habitat connectivity. PIR 940. Plaintiffs argued that the Bull Run project is similar to the Rancheria project, where the USFS ordered a supplemental NEPA analysis in light of concerns about "habitat fragmentation and loss of connectivity caused by the Cedar Fire." PIR 988. They contended that the USFS undertook no supplemental analysis to ensure that the fisher population in the Southern Greenhorn Mountains was not isolated in the wake of the fire. PIR 1002.

Like the Pacific fisher, the CSO is sensitive but not endangered or threatened. The USFS undertook an analysis of the potential effects on the CSO, examining metrics including total available habitat and acres treated; estimated changes in structural characteristics of the habitat, such as canopy, snags, and large woody debris; disturbance effects; and the number of acres treated of certain habitat types and changes in percentage of relative habitat. BE 51. Field surveys conducted in the last three years identified four CSO territories near the project area. Two of the four CSO territories near the project area have minimal overlap with the planned area, BE 26-27, a third has likely been abandoned, BE 28-29, 56, and the fourth will have a monitor on site for any felling during the project, and if nesting owls are present, the project will be subject to a limited operating period, BE 10. Like the Pacific fisher, CSOs nest away from roads, and CSO habitat near roads is lower quality. BE 54. Accordingly, the USFS found that the Bull Run project would have limited disturbance effects and be unlikely to result in significant losses of live foliage and canopy, strong habit factors for CSO. BE 56.

With respect to CSO, Plaintiffs submitted two research summaries during the comment period

that they contend the USFS did not adequately address. The first is a CSO ESA listing petition that Plaintiffs submitted with their comments, containing data from nine reports, which included evidence that Plaintiffs characterized as showing that most owl territories retain occupancy after a fire but that post-fire logging reduces the suitability of that habitat. PIR 127-31. The second is an evaluation prepared by Chad Hanson, a member of Plaintiff Earth Island Institute, that included supplemental comments and summaries of additional studies, which he believed to show that even low levels of post-fire logging within 1500 meters of territory centers show "severe adverse impacts" on CSO occupancy. Mot. at 19 (citing PIR 1309-12).

Finally, on May 1, 2017, the USFS proposed the Spear Creek project to abate hazard trees on the western side of the Greenhorn Mountains. ECF No. 22-8, Excerpts from Proposed Spear Creek Roadside Hazard Tree Mitigation Project. Bull Run and Spear Creek are located in different watersheds on opposite sides of the Greenhorn Mountains. BE 6; BA 9, 11. Unlike Bull Run, Spear Creek is located within the Giant Sequoia National Monument (GSNM) and is subject to the special requirements of the GSNM Management Plan.

### III. LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "An injunction is a matter of equitable discretion" and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 376. The Ninth Circuit has adopted a "sliding scale" approach under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This test allows for the issuance of a preliminary injunction "where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in

1  [plaintiff's] favor," so long as the plaintiff also satisfies the final two prongs of the *Winter* test.  *Id.*

2  (internal citation and quotation marks omitted) (alteration in original); *id.* at 1135.

3      "An agency's determination that a particular action falls within one of its categorical exclusions

4  is reviewed under the arbitrary and capricious standard."  *Alaska Ctr. for Environment v. United States*

5  *Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999).  Furthermore, "an agency's interpretation of the

6  meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or

7  inconsistent with the terms used in the regulation."  *Id.*

8  **A.    NEPA**

9      The National Environmental Policy Act (NEPA) "is a purely procedural statute."  *Neighbors of*

10  *Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002).  NEPA does not dictate particular

11  results or require that agencies elevate environmental impacts over other concerns.  Instead, NEPA

12  provides a process to ensure that agencies take a "hard look" at the environmental consequences of their

13  actions.  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752

14  F.3d 755, 763 (9th Cir. 2014).  NEPA serves the dual purposes of informing agency decision-makers of

15  the environmental effects of proposed federal actions and ensuring that relevant information is made

16  available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

17      Agency compliance with NEPA is reviewed under the Administrative Procedure Act (APA).  5

18  U.S.C. §§ 701–706; *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir.

19  2012).  Review is generally limited to the administrative record that was before the agency at the time of

20  its decision.  *Grand Canyon Trust*, 691 F.3d at 1016 n.10; *Sw. Ctr. for Biological Diversity v. U.S.*

21  *Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996).  A court may set aside an agency action only if it

22  determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

23  accordance with law."  5 U.S.C. § 706(2)(A).  This standard of review is "highly deferential, presuming

24  the agency action to be valid and affirming the agency action if a reasonable basis exists for its

25  decision."  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)

(quotation and citation omitted).

Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA . . . ." *Id*. The Ninth Circuit has held that "[t]he [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Id*. (quotation and citations omitted). The APA does not allow a reviewing court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Id*. This is especially true in the context of management of USFS lands, for Congress has consistently acknowledged that the agency must balance competing demands in managing National Forests. *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

## IV. <u>ANALYSIS</u>

### A. <u>Standing</u>

To establish standing, a plaintiff must demonstrate, "at an irreducible minimum," (1) that he personally suffered some actual or threatened injury (injury in fact); (2) that the injury can be traced to the challenged conduct of the defendant (causation); and (3) that the injury is likely to be redressed by a favorable judicial decision (redressability). *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). An association has standing to bring suit on its members' behalf if: "[1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 169 (2000). Critically, in a case brought under the ESA or another environmental-protection statute, the requisite injury in the standing context needs to be

to the plaintiff, not to the environment. *Id.*

Plaintiffs submit declarations from two members who have visited the Bull Run and Spear Creek project areas in the past and intend to do so in the future. *See* ECF No. 10-5, Declaration of Ara Marderosian (Marderosian Decl.) ¶¶ 7-12; ECF No. 10-4, Declaration of Dr. Chad Hanson (Hanson Decl.) ¶¶ 7-11. Plaintiffs allege injury to their "recreational and esthetic interests" if the felling and logging portions of the Bull Run project are permitted to proceed. *See Friends of the Earth,* 528 U.S. at 181 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). Plaintiffs' members have standing, and the Plaintiffs have associational standing. *See Friends of the Earth*, 528 U.S. at 181 (an "association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"); *see* Marderosian Dec. ¶ 3; Hanson Dec. ¶ 3 (explaining Plaintiffs' purposes). Plaintiffs seek to enforce a procedural right, namely the USFS's alleged failure to conduct an EA or EIS prior to undertaking this project and analyzing the Bull Run effects in a separate analysis from the Spear Creek project. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (a "'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy'") (quoting *Lujan*, 504 U.S. at 573 n.7 (1992)).

Defendants do not challenge Plaintiffs' standing to bring this suit, and the Court finds that Plaintiffs do have standing.

**B.**     **Likelihood of Success On The Merits**

       **1.**     **Applicability Of Categorical Exclusions**

The key issue is whether the commercial logging activities proposed here fit into a categorical exclusion (CE) for "[r]epair and maintenance of roads, trails, and landline boundaries." 36 C.F.R. §220.6(d)(4). Generally, CEs are certain defined categories of activities that an agency, like USFS, has determined through prior evaluation and regulatory action to be exempt from the requirement that the agency prepare EAs or EISs. The USFS has promulgated numerous CEs for its forestry and land management activities. Several are at issue in this case, but two are of particular importance: CE-13, which applies to "[s]alvage of dead or dying trees not to exceed 250 acres," 36 C.F.R. §220.6(e)(13) ("salvage CE"); and CE-4, which applies to the "repair and maintenance of roads," 57 Fed. Reg. 43,180 ("road maintenance CE").[2] Defendants argue that the project falls under the road maintenance CE because it is a form of routine road maintenance. Plaintiffs argue that because the project involves salvage of dead trees, the salvage CE provides limiting conditions, including the 250-acre limitation. Because the project exceeds 250 acres, Plaintiffs argue the action does not fall within a CE and the project may not proceed without an EA or EIS.

Plaintiffs rely on a 2008 case from the Central District of California, *Los Padres Forestwatch v. U.S. Forest Service*, No. CV-08-845-GW (MANx) (C.D. Cal. July 3, 2008), the only case that squarely addresses Plaintiffs' contention that CE-13 limits the acreage of any salvage operation the USFS attempts to cover under a CE (and therefore exempt from normal NEPA requirements). The *Los Padres* decision, which is unpublished, rejected a plan similar to the one at issue here, where the USFS sought to rely on the road maintenance CE for a project that included commercial salvage of dead trees near roads.

_____

[2] The USFS has also argued that the activities would fall under other CEs for "[t]imber stand and/or wildlife habitat improvement activities," 36 C.F.R. §220.6(e)(6), and for "[p]ost-fire rehabilitation activities," 36 C.F.R. §220.6(e)(11), but the proposed "salvage" activities do not neatly fit into either category, which include as examples activities like tree planting, repair of damage to minor facilities, thinning brush, and prescribed burning.

Generally, "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999). Furthermore, "an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Id*. The key question is whether the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion. *Id*. at 858.

The *Los Padres* court found unreasonable USFS's conclusion that the commercial salvage of dead trees along roadsides fell under the road maintenance CE rather than the salvage CE, reasoning that the salvage CE limited the number of acres that could be treated through salvage operations under a CE. ECF No. 10-12, *Los Padres* slip opinion, at 15-19. The district court was unpersuaded by the USFS's argument that the major environmental effect occurred when roads went in, such that salvage activities near roadsides had different potential environmental effects than salvage away from roadsides. The court emphasized that the salvage CE has no restrictions concerning the <u>type</u> of land (roadside v. non-roadside) but does contain two other types of restrictions: (1) that no more than 250 acres be affected and (2) that there be "no more than ½ mile of temporary road construction." *Id*. at 16 n.19. *Los Padres* concluded that because the agency determined that acreage <u>does</u> matter when undertaking salvage logging, the agency is not free to ignore that determination by selecting a different CE that makes no mention of salvage logging.

Here, the USFS advocates rejection of *Los Padres*' reasoning, arguing that the agency is entitled to broad deference when interpreting its own regulations and that in promulgating the salvage CE, the USFS did not restrict the scope of other CEs *sub silentio*. Defendants are correct that the *Los Padres* decision does not overtly afford USFS the deference agencies are normally given in interpreting the scope of their own CEs. Nonetheless, *Los Padres* raises an important issue that must be addressed in

order to apply the proper standard of review: whether it is reasonable to interpret a project that "salvages" hazard trees on a large scale as "routine road maintenance."

The USFS points to several cases in which courts found that USFS reasonably concluded projects to fell and salvage dead "hazard" trees along roads on more than 250 acres fell within the scope of the road maintenance CE. *Native Ecosystems Council v. Krueger*, No. 13-167, 2014 WL 9954189, at *10 (D. Mont. June 4, 2014) (affirming USFS's use of road-maintenance CE to fell fire-damaged trees along roads, removing trees from 300 acres and potentially affecting 730 acres); *Forest Conservation Council v. U.S. Forest Serv.*, No. 03-54, 2003 WL 23281957, at *3 (D. Ariz. July 9, 2003) (finding "rough comparability" between road-maintenance CE and post-fire salvage logging on 14,951 acres along roads), *aff'd*, 110 F. App'x 26 (9th Cir. 2004) (holding "[i]t was not arbitrary or capricious for the agency to conclude that [project] fell within the parameters of categorical exclusions 31.1(b)(3), (4) and (5)"). Of these cases, only one, *Forest Conservation Council*, also discusses the salvage CE. It reviewed a project in Arizona that allowed salvage logging of dead trees in a National Forest. 2003 WL 23281957, at *1. First, dead trees would be removed from approximately 15,000 acres within 500 feet of the boundaries of administrative sites, developed recreation sites, and identified concentrated use areas; within 200 feet of the center line of highly traveled roads open to motor vehicle traffic; and within 100 feet of the center line along heavily used forest system trails. *Id.* Another aspect of the project would remove dead trees within one-half mile of private land boundaries on 19,364 acres of land. *Id.* The district court found that USFS reasonably concluded that the first aspect of the project fell within the road maintenance CE.

> [R]emoving dead trees within 200 feet of roads and 100 feet of trails relates generally to the repair and maintenance of roads and trails. Again though, the examples given are far more modest than the action proposed here (grading a road, pruning vegetation). And, removing dead trees within 500 feet of recreation sites generally relates to the repair and maintenance of recreation sites and facilities. But again, the examples given are far more narrow (applying insecticides and repaving a parking lot). If we were deciding this issue *de novo,* we might have concluded that the action proposed by the roads and trails decision, while within the general description of the categorical exclusions, is far more expansive than the examples given and thus the exclusions would not apply. But we are

not reviewing this *de novo.* We must give the agency's interpretation controlling weight unless it is plainly erroneous or inconsistent with the terms used in the categorical exclusion. We cannot say that the agency's interpretation here is inconsistent with the terms used in the categorical exclusion. There is rough comparability. For example, the major environmental impact occurred when the roads went in. We thus cannot say that the agency's interpretation is plainly erroneous.

*Id*. at *3.

As to the other aspect of the project, the district court rejected the Forest Service's argument that removal of dead trees within one-half mile of private land boundaries fell within a separate categorical exclusion for "Timber stand and/or wildlife habitat improvement activities which do not include the use of herbicides or do not require more than one mile of low standard road construction." Examples given in that CE are thinning or brush control to improve growth or to reduce fire hazard, the opening of an existing road to a dense timber stand, and prescribed burning. The district court found:

The removal of dead trees within one-half mile of all private land boundaries does not fit within the general description of timber stand and/or wildlife habitat improvement activities. Nor do any of the examples support such a vast program.

*Id*.

In evaluating the application of the habitat improvement CE, the *Forest Conservation Council* decision addressed whether the salvage CE would apply, because it "specifically addresses timber harvest and salvaging wood from dead or dying trees." But, as the district court noted, the USFS did not rely on this categorical exclusion because its motivation was to create a fire break and because at the time that case was filed, the salvage CE had been invalidated by *Heartwood v. United States Forest Serv.,* 73 F.Supp.2d 962 (S.D. Ill. 1999). Even assuming the salvage CE remained valid, the district court noted the board feet that it would allow was "infinitely less than that proposed here." WL 23281957, at *3-4. Yet the district court nowhere suggested that the salvage CE limited the application of other CEs. Rather, it concluded that the habitat improvement CE could not be stretched to fit the circumstances of the proposed project and at least suggested that USFS could choose between potentially overlapping CEs . Moreover, as mentioned, earlier in the decision, the district court found

13

that the road maintenance CE did fit the circumstances of a project that is strikingly similar to the Bull Run project without ever mentioning the salvage CE, of which it was undoubtedly aware. In sum, unlike *Los Padres*, the *Forest Conservation Council* court did not treat the salvage CE as a limit on other types of projects that involved some form of "salvage", but which could arguably be covered by another CE.

In reply, the Plaintiffs point to three other USFS projects involving roadside hazard salvage timber sale projects in which the agency elected *not* to use any CE and instead went through the process of preparing EAs, presumably to point out inconsistencies in USFS application of NEPA. However, it is impossible to tell why the agency elected to prepare an EA for those projects. The Court cannot determine on the present record whether or not the requirement could have been triggered by some independent factor (*e.g.* the possibility of harm to sensitive species on those lands). Interestingly, in both of these EAs, hazard tree removal is mentioned as a component of road maintenance. For example, in the Nez Perce Roadside Hazard Tree Project situated in a National Forest in Idaho, it is acknowledged that "removal" of hazard trees is part of normal road maintenance, but the EA insists that the Nez Perce project is "not a salvage project." U.S. Dep't of Agric., Decision and Notice and Finding of No Significant Impact, Nez Perce Roadside Hazard Tree Project at 9 (June 2013)[3] ("This is not a salvage project. Hazardous trees will be removed from the roadway during normal road maintenance or felled with this project. In either case, the Nez Perce Forest will comply with Forest Plan direction to provide safe and effective transportation systems (NPFP, II-1, 2) by removing danger trees."). In the Rim Fire Hazard Tree Project, situated within the Sierra National Forest near Yosemite National Park, the project involves a range of road maintenance activities and the discussion of that activity suggests hazard tree removal is part of road maintenance. U.S. Dep't of Agric., Rim Fire Hazard Trees Environmental

---

[3] Available at:
http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/94223_FSPLT3_142511 3.pdf (last visited Nov. 16, 2017).

1  Assessment, at 9-10 (March 2014)[4] ("Road maintenance preserves the drainage function or

2  serviceability of the road.  Maintenance activities generally include: blading; brushing; removal of

3  hazard trees; repair or replacement of road surfaces; cleaning, repair or installation of drainage structures

4  such as culverts, dips and ditches; dust abatement; and, installation or repair of signs.  Maintenance

5  actions generally do not disturb ground outside the existing road profile . . . other than removal of

6  material around culvert inlets.").

7         The Nez Perce EA seems to suggest that hazard tree "removal" can be considered a form of road

8  maintenance, but makes a point of specifically denying that the project is a "salvage" project.  As a

9  result, it is unclear how relevant Nez Perce is to the present circumstances.  Here, on the one hand, a

10  large portion of the Bull Run project is being handled through a "salvage" timber contract that permits

11  the removal of dead hazard trees.  On the other hand, the project description seems to impose some

12  restrictions on the removal of trees, permitting removal only where necessary to avoid road obstruction

13  or excessive fuel loads, or when removal is needed to promote re-forestation projects.  In other words,

14  the Court cannot determine with certainty at this stage of the case to what extent the Bull Run project is

15  a true commercial "salvage" operation or whether it is, in practice, more like the Nez Perce project, or

16  whether, possibly, this is a distinction without a difference.[5]

17         For purposes of this motion for a preliminary injunction, the Court need not definitively

18  determine the issue on the merits; it is enough to conclude that success on the merits as to the CE issue

19  is unclear.  There are authorities pulling in both directions.  The single case, *Los Padres*, that suggests

20  the salvage CE should be treated as a limit on other CEs so holds in contravention of the general

21  principle that agencies should be afforded deference in interpreting the scope and meaning of their own

22  _____

23  [4] Available at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3792599.pdf (last visited Nov. 16. 2017).

24  [5] Plaintiffs also point out that in promulgating CE-13, USFS reviewed numerous example projects to determine the 250-acre
   project size, including some roadside hazard projects.  Reply at 3.  The Court does not find this particularly troubling.  The
   fact that USFS cast a wide net to expand its sample size for determining an appropriate acreage limitation for CE-13 does not

25  change the legal analysis herein that concludes that nothing precludes USFS from applying an overlapping CE to a project
   that might, if smaller in size, also qualify under CE-13.

1  CEs.  Other cases directly suggest that hazard tree removal (even on a large scale) is a reasonable

2  application of the road maintenance CE.  The Court finds the latter cases more persuasive, particularly in

3  light of the applicable deferential standard and in the absence of any statute, regulation, or binding case

4  law that even remotely mandates the holding in *Los Padres*.[6]  For the purposes of preliminary injunctive

5  relief, the Court finds that on this issue, the Plaintiffs have not met their burden of demonstrating that the

6  likelihood of success tips in their direction.

7           **2.        Finding Of No "Extraordinary Circumstances"**

8           Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of

9  NEPA compliance, albeit one that requires less than where an environmental impact statement or an

10  environmental assessment is necessary."  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096

11  (9th Cir. 2013).  However, USFS may rely on one or more CEs to avoid preparing an EA or EIS for a

12  project "only if there are no extraordinary circumstances related to the proposed action."  36 C.F.R. §

13  220.6(a).  Extraordinary circumstances are those circumstances "in which a normally excluded action

14  may have significant environmental effect."  40 C.F.R. § 1508.4.  The Forest Service has identified

15  various "resource conditions" that should be considered in determining whether extraordinary

16  circumstances related to a proposed action warrant further analysis and documentation in an EA or an

17  EIS, 36 C.F.R. § 220.6(b)(1), including "Federally listed threatened or endangered species or designated

18  critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service

19  sensitive species," *id*. § 220.6(b)(1)(i).  The "mere presence" of one or more resource conditions does

20  not preclude the agency's use of CEs; "[i]t is the existence of a cause-effect relationship between a

21  proposed action and the potential effect on these resource conditions, and if such a relationship exists,

22  _____

23  [6] Contrary to Plaintiffs' suggestion, this conclusion does not render CE-13 "meaningless, because [USFS] could always chose another CE rule any time a timber sale exceeded 250 acres based on 'ecosystem management' components of such timber sales."  *See* Reply at 2.  As is the case here, the project in question must reasonably fall within the scope of whatever
24  alterative CE is invoked. A project that had nothing to do with road maintenance could not fall within the scope of the road maintenance CE.  *See, e.g., Forest Conservation Council*, 2003 WL 23281957, at *3 (fire break project did not fall within scope of CE for "[t]imber stand and/or wildlife habitat improvement activities" in part because the examples of such
25  activities were nothing like the proposed fire break project).

the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* § 220.6(b)(2).

"When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). "Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr.*, 189 F.3d at 859.

### a. <u>Potential Effects On Mountain Yellow-Legged Frog</u>

Plaintiffs contend that the USFS has failed to explain why its actions will have an insignificant effect on the mountain yellow-legged frog, which is listed as federally endangered under the Endangered Species Act. PIR 1366. They point to the statement of FWS that the project "may affect and is likely to adversely affect the mountain yellow-legged frog." PIR 1359. They quote the Revised Decision Memo's conclusion that the project "will not jeopardize the continued existence of the mountain yellow-legged frog (Biological Opinion, page 13)," but complain that the Decision Memo does not discuss or explain "why the killing and 'taking' of the frogs is insignificant." Mot. at 16. Plaintiffs draw parallels with *Conservation Congress v. U.S. Forest Serv.*, No. CIV. 2:12-02416 WBS, 2013 WL 2457481 (E.D. Cal. June 6, 2013), where a court in this District granted a motion for a preliminary injunction where the USFS had concluded that the action may affect the Northern spotted owl but "failed to establish in the record that the project's effects were insignificant." Mot. at 16 (citing *Conservation Congress*, 2013 WL 2457481, at *8). The court there found that the determination that there were no extraordinary circumstances "[did] not appear to be supported by the record." 2013 WL 2457481, at *7.

Here, the Court finds, at least for purposes of this preliminary injunction motion, that the USFS

did adequately explain why the project's effects would be insignificant.  First, the MYLF is not known to be present in the area.  FWS's conclusion that the project "may affect and [is] likely to adversely affect" MYLF in the area was "based on . . . an inability to guarantee that no take to the species or their habitat would occur with implementation of the project."  BiOp 20.  Though there are no known occurrences of the MYLF in the project area, and all three documented populations of MYLF within the Sequoia National Forest are in the Golden Trout Wilderness in the Little Kern River drainage, located approximately 20.5 miles from the project area, no recent comprehensive surveys have been performed to determine whether MYLF exist in the project area.  BiOp 12.  Surveys in perennial streams in the nearby Greenhorn Mountains in 2000 and 2001 did not detect the presence of MYLF, and no recent comprehensive surveys have been performed to determine whether MYLF exist in the project area.  *Id*.  FWS concluded, however, that if MYLF populations do exist in the project area, "population numbers are quite likely very low due to the habitat loss from recent fires and the last four years of intense drought conditions that have eliminated aquatic habitat from many of the streams and meadows within the action area," though last winter's high snowfall was expected to return the aquatic conditions to pre-drought levels.  BiOp 12.

In the BA, the USFS outlined a number of potential adverse effects resulting from the project.  Felled trees could crush frogs at various stages of development, and noise and disturbances in the project area could alter the behavior of individual frogs, driving them from preferred locations into areas with lower-quality resources.  PIR 1371.  Felling trees near sensitive aquatic areas may increase sedimentation in aquatic habitats, which may potentially fill deep-pool breeding habitats; may fill "interstitial spaces" in aquatic habitats that decrease available areas for adults, juveniles, and tadpoles to seek cover; and may "increase water turbidity and decrease dissolved oxygen levels, thereby decreasing survival of eggs."  BiOp 12.

To mitigate the effect of these potential adverse effects, the project includes 30 "site-specific measures" designed to minimize the risks associated with the project.  BA 27-30; BiOp 4-7.  For

instance, tree felling within 100 feet of perennial and intermittent streams and meadows would be done with vehicles and other operating equipment restricted to the roadway, would be felled by hand, away from streams and culverts to the extent possible, left on site, and include no follow-up fuels treatment.[7] BA 27; BiOP 4.

Despite the potential impacts discussed in the BA and BiOp, FWS stated its belief that "the risk of adverse impacts to individuals is low. Many of the treatment areas are located along the upper two-thirds of the slope where channel widths and depths are decreased, representing lower quality habitat for mountain yellow-legged frog for breeding purposes." BiOp 13; PIR 1371. Because MYLFs are "highly aquatic," especially during summer months when activities would most likely take place, "it is expected that activities outside of suitable habitat (82 feet) have a lower likelihood to directly crush and kill" MYLFs. *Id*. The 30 site-specific measures designed to minimize risks associated with the project "will further reduce adverse effects to this species." *Id*. In concluding that the project is "not likely to jeopardize the continued existence of" the MYLF, FWS explained:

> The proposed project has been designed to minimize adverse effects to individual mountain yellow-legged frogs and maintain habitat components important to the species; the effects to mountain yellow-legged frog suitable habitat is small and discrete, relative to the entire range of the species; and, the proposed project is expected to result in higher forest ecosystem resiliency, thereby benefitting the mountain yellow-legged frog. The overall expectation is that the proposed project will maintain or enhance the conservation value of habitat for the frog within the action area by creating habitat conditions that are less conducive to future high-severity fires. In addition, the proposed project will, over time, result in improved aquatic and upland habitat conditions for the frog, such as decreased soil erosion rates and improved breeding habitat. The proposed project will, over time, result in increased growth of streamside vegetation, creating a variety of micro-climates for optimum water temperature and basking sites allowing frogs to better thermo-regulate, and improved upland refugia habitat conditions adjacent to streams.

BiOp 13.

In addition to these low potential adverse effects in the short term, the FWS concluded that "[w]hile project activities will slightly increase these adverse effects beyond current fire-caused levels,

---

[7] The objectives of these measures are to decrease "risks of crushing, injuring or disturbing individual MYLFs in suitable breeding habitat (e.g. within 25 meters of streams and meadows)" and to "maintain favorable conditions such as water quality, and stream channel characteristics." BA 27; BiOp 4.

1  overall restoration activities will result in improved habitat conditions over time."  BiOp 12.  This

2  conclusion is supported by the record and is consistent with the USFS's determination that it was

3  unlikely that the project would cause significant harm to MYLF.

4  ### b.    Potential Effects On Pacific Fisher

5      Plaintiffs contend that the USFS failed to explain why the potential adverse effects on the Pacific

6  fisher are insignificant because it did not address habitat connectivity issues arising from the Cedar Fire.

7  Mot. at 16-17.  Plaintiffs argue that the Bull Run project is similar to the Rancheria project, where the

8  USFS ordered a supplemental NEPA analysis in light of concerns about "habitat fragmentation and loss

9  of connectivity caused by the Cedar Fire."  PIR 988.  Plaintiffs argue that the USFS "has already

10  determined that there may be significant cumulative effects from the combination of the Rancheria

11  Project and the Cedar Fire," and that despite the prior acknowledgement that the fire may lead to

12  isolated fisher populations, the USFS here did not address the issue.  Mot. at 17.  In particular, Plaintiffs

13  argue that the USFS did not respond to Plaintiffs' concerns in their comments that an isolated fisher

14  community would suffer adverse effects as a result of a limited gene pool and the resultant lowered

15  genetic health of the population.  *Id.*  The issue was enough to warrant a supplemental analysis for the

16  Rancheria Project, they argue, but led to no analysis here.

17      The Bull Run project differs from the Rancheria project in a few important respects.  First, the

18  USFS ordered supplemental NEPA analysis for the Rancheria Project because the biological evaluation

19  for that project had been completed in 2013, prior to the Cedar Fire, and the "vegetation changes from

20  tree mortality and recent wildfires . . . present[ed] new information that was not previously addressed."

21  PIR 988; *see also* ECF No. 22-9, Rancheria Supplemental Information Report, at 10 ("The habitat

22  fragmentation and loss of connectivity caused by the effects of the Cedar Fire was not considered in the

23  2013 Fisher BE.  This change in conditions may be significant and alter the conclusions made in the

24  original determination for this project.").  The BE here, by contrast, was performed post-fire and with

25  the pertinent circumstances accounted for.  Moreover, the Rancheria project involved "commercial

thinning" and "fuels treatment (pre-commercial thin and [prescribed] burn)" over an area almost 1800 acres larger than the 488 acres of fisher habitat at issue here.  BE 63-64.

The BE discusses, among other threats to fishers in the Sierra Nevada population, the risk associated with habitat fragmentation, noting that activities giving rise to "habitat fragmentation or population pose a risk to the persistence of fishers."  BE 47.  The BE notes that the existence of roads can alone result in the loss of habitat connectivity and cites studies on fisher populations near roads, which suggested that fishers "favored landscapes with more contiguous, unfrequented forests and less human activity."  BE 47.  A study in portions of the Sierra Nevada found that the presence of fishers was "negatively associated with road density."  BE 47.  The BE notes that the placement of roads has already affected the canopy cover in the area, BE 52, and that the project "focuses its efforts to encompass areas of highest burn severity where low canopy cover and structural attributes needed for resting and denning activity are no longer present."  BE 54.  Live trees with canopy cover would not be felled.  BE 65.  Research in the Sierra National Forest has shown that fishers do not use "high severity burn areas" at least in the immediate aftermath of the fire, though there is "some evidence of limited foraging occurring along the burn edge."  BE 54.  There are "no den sites in the project analysis area."  BE 48.  Outside of the "small linear strip of habitat (300 feet on each side of the road)," BE 52, snags will remain untreated, and even within the treatment area, the design criteria call for an "average of four snags per acre retained in the treated areas."  BE 54.  Despite being lower-quality habitat less likely to be used by fishers, the roadways in the project area "are not anticipated to be rendered unusable and will continue to provide for foraging and dis[per]sal activities to occur."  BE 52.

Plaintiffs object that the BE fails to address their concerns about habitat connectivity, but given the lengthy discussion of pertinent studies, the low quality of the habitat in the project area, and low likelihood of fishers present in the area, the USFS reasonably determined that the action would not significantly affect fishers.

**c.** **Potential Effects On California Spotted Owl**

The Federal Defendants describe the BE's examination of the Bull Run project's potential effects on the CSO as a "detailed, quantitative analysis" that used "multiple metrics," including total available habitat and acres treated; estimated changes in structural characteristics of the habitat, such as canopy, snags, and large woody debris; disturbance effects; and the number of acres treated of certain habitat types and changes in percentage of relative habitat. Opp. at 16 (citing BE 51). The USFS also examined research on the effects of wildfire and post-fire logging on CSO habitat. *Id.* (citing BE 32-34).

Plaintiffs argue that the USFS failed to address two research summaries they presented. First, they argue that the USFS did not address a CSO Endangered Species Act listing petition that Plaintiff John Muir Project submitted with its comments. Mot. at 18. The listing petition, containing data from nine reports, included evidence that Plaintiffs characterized as showing that most owl territories retain occupancy after a fire but that post-fire logging reduces the suitability of that habitat. *Id.* Federal Defendants respond that some of these studies were discussed in the BE[8] and that Plaintiffs' summary does not describe the studies as addressing snags and hazard trees along roads, like the project at issue here. The BE's discussion of the scientific literature also includes explanations concerning studies on which it placed less weight. For example, its discussion of one study finding spotted owls selectively foraging in high-severity burn areas explains that the study was based on a small sample size, for a short duration, long after the fire event, and that at least one of the owls was later spotted far outside the high-severity burn zone. PIR 1415; BE 34. These are "scientific judgments and technical analyses within the agency's expertise," an area over which courts are to be "at our most deferential." *Lands Council*, 629 F.3d 1070, 1074 (9th Cir. 2010) (alteration omitted); *id.* ("We are not to 'act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty.'") (citation omitted). The USFS reviewed and summarized a number of

---

[8] The USFS addressed two of the nine studies. A third was cited in a different context. Reply at 10 n.10.

recent studies, offering a reasoned evaluation of the literature on post-fire occupancy, and the agency's decision to discuss in detail certain recent studies it deemed important rather than each one suggested by Plaintiffs did not render arbitrary and capricious USFS's determination that no extraordinary circumstances exist with respect to the fisher.

Second, Plaintiffs argue that the USFS failed to address an evaluation prepared by Chad Hanson, a member of Plaintiff Earth Island Institute, that included supplemental comments and summaries of additional studies that he concluded showed that even low levels of post-fire logging within 1500 meters of territory centers show "severe adverse impacts" on CSO occupancy. Mot. at 19 (citing PIR 1309-12). Federal Defendants respond that this letter is not a peer-reviewed scientific study, it does not disclose his definitions of measures he used for his evaluation, and it does not address the types of treatments planned for Bull Run. Opp. at 17. The Court finds that this is an area of agency expertise, and the Court cannot substitute its own judgment for that of the USFS to resolve competing expert opinions. *See Price Road Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1511 (9th Cir. 1997) ("We have consistently rejected such attempts [to engage in a battle of the experts], noting that 'when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'") (citation omitted).

In sum, for purposes of the present motion, Plaintiffs have not established likelihood of success on the merits on their contention that use of a CE for the Bull Run project was inappropriate because of extraordinary circumstances related to the species discussed above.

### 3. Decision To Analyze Bull Run And Spear Creek Separately

Plaintiffs next take issue with the USFS's decision to analyze the Bull Run project separately from the Spear Creek project. Regulations from the Council on Environmental Quality ("CEQ") direct agencies to consider connected, cumulative, or similar actions "in an environmental impact statement." 40 C.F.R. § 1508.25; *see also id.* § 1502.4 ("Agencies shall use the criteria for scope (§ 1508.25) to

determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."). Because this language is limited by its terms to actions requiring an EIS, it does not apply to agency actions proceeding under a CE. *See Salazar*, 706 F.3d at 1097 ("[A]pplication of section 1508.25's requirements to categorical exclusions is inconsistent with the efficiencies that the abbreviated categorical exclusion process provides. . . . Accordingly, we conclude that section 1508.25's requirements do not apply to [the agency's] categorical exclusion analysis in this case."). Because the Court has found, at least preliminarily, that the UFSF's application of the road maintenance CE was reasonable under the circumstances and that there were no extraordinary circumstances that would exempt the project from coverage under the CE, the analysis of this argument could end there. However, even if the Court assumes that 40 C.F.R. § 1502.4(a) applies to cases involving the application of CEs, Plaintiffs' argument is not a particularly powerful one.

Where an EIS is required, the Ninth Circuit applies "an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS. The crux of the test is whether 'each of two projects would have taken place with or without the other and thus had independent utility.'" *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 795 (9th Cir. 2014). A plaintiff must show that an agency's decision not to prepare a single EIS was an arbitrary action. *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.").

Plaintiffs argue that the Bull Run and Spear Creek project are really a single course of action, 40 C.F.R. § 1502.4(a), because both arose to address the consequences of the same fire and were indeed originally proposed as a single project. Mot. at 21 (citing PIR 1, PIR 5). Plaintiffs argue that the actions are both cumulative and connected under the regulations. Cumulative actions are defined in the pertinent regulation as those that "when viewed with other proposed actions have cumulatively

24

significant impacts." 40 C.F.R. § 1508.25(a)(2). In turn, a cumulative impact is defined by the CEQ regulations as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Plaintiffs argue that because the projects will likely have similar effects on sensitive wildlife species, they are cumulative, pointing to the potential effects on the fishers and the decision to perform a supplemental analysis in the Rancheria project because of concerns about the loss of connectivity. For the reasons outlined in the section on extraordinary circumstances and the fisher, the Court does not find that the Plaintiffs have raised serious questions about whether the actions together could cumulatively have significant impacts. In addition, "[m]indful of the deference that agencies are to be accorded in scientific matters," *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 1000 (9th Cir. 2004), this record does not compel the agency to analyze the two projects as one.

Plaintiffs also argue that the two projects are connected actions, meaning that they "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25. Because the projects involve portions of the same roads, they argue, completion of one project but not the other may lead to routes on either side of the Greenhorn Mountains to be cut off from each other. Mot. at 22-23.

Bull Run and Spear Creek are located in different watersheds on opposite sides of the Greenhorn Mountains. BE 6; BA 9, 11. In addition, Spear Creek is located within the Giant Sequoia National Monument (GSNM) and is subject to the special requirements of the GSNM Management Plan, while Bull Run is not. The projects are proceeding on separate timelines. Sierra Forest Products argues that Bull Run will increase public safety for users accessing the forest from the east, a benefit that exists regardless of whether and when the Spear Creek project on the west side of the Greenhorn Mountains is completed. Sierra Opp. at 18. The Court agrees.

Finally, the USFS analyzed the potential cumulative effects of Bull Run and Spear Creek together on various wildlife (excluding the MYLF because the projects are in different watersheds and the MYLF has not historically been located within the Spear Creek range) under a worst-case scenario set of conditions.  BE 58.

The USFS is not subject to the regulations governing cumulative and connected actions, but even if they did apply to the USFS's project proceeding under a CE, the USFS would not be required to assess the projects' effects as a cumulative or connected action.

## C.    Likelihood Of Irreparable Harm

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987).  A mere *possibility* of irreparable harm is insufficient; *Winter* requires a showing that the alleged harm is *likely* to take place.  *Winter*, 555 U.S. at 22.

Plaintiffs argue that "[l]ogging generally constitutes irreparable harm," Mot. at 23, though this is not "per se enough to warrant an injunction because it constitute[s] irreparable environmental harm." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).  The Ninth Circuit has "declined 'to adopt a rule that any potential environmental injury automatically merits an injunction,'" especially where a court finds that the plaintiffs are unlikely to succeed on the merits of their claims.  *Id.* (quoting *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008)).  Plaintiffs submit declarations from two of their members, who have visited the areas covered by the proposed project and intend to do so in the future.  Hanson Decl. ¶ 7; Marderosian Decl. ¶ 8.  Plaintiffs claim that logging will cause irreparable harm because it will remove the ability of Plaintiffs' members to experience the land in an undisturbed state.  Mot. at 23.  The Court finds this form of harm to be objectively minimal under the circumstances.  The project will fell dead and dying trees in low-quality habitat within 300 feet of roads, leaving 88% of

the Cedar Fire area untouched and hundreds of thousands of snags intact. Opp. at 19. Plaintiffs next argue that the project is likely to cause irreparable damage to the MYLF, fisher, or CSO. The pertinent question is the "degree of adverse effect on a species, not the impact on individuals of that species." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006). Here, given that there are no reported instances of MYLF or fisher in the project area, the Court finds that irreparable harm to those species is unlikely. Even if they are present, as discussed above, the harm is not likely to be great. As for the CSO, two of the four CSO territories near the project area have minimal overlap with the planned area, BE 26-27, a third has likely been abandoned, BE 28-29, 56, and the fourth will have a monitor on site for any felling during the project, and if nesting owls are present, the project will be subject to a limited operating period, BE 10. At least on the present record, the showing of irreparable harm to CSO is minimal.

**D.    Balance Of Equities**

Although the analyses of the public interest and balance of equities merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), Defendant-Intervenor's interest in this case necessitates a separate analysis of this factor. While economic losses and irreparable environmental harm are both relevant factors, Plaintiffs argue that the balance of equities tips strongly in their favor because the environmental "harms they face are permanent, while the intervenors face temporary delay." *Connaughton*, 752 F.3d at 765 (citing *Amoco*, 480 U.S. at 545 ("If such [irreparable environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir.2009) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction."). Defendant-Intervenor contends that delay might carry with it the possibility that the quality of hazard trees will decline, resulting in a significant reduction in the "volume and value of the harvested timber." ECF No. 17, Declaration of Darren Mahr ¶ 20. Nevertheless, had Plaintiffs demonstrated a risk of

environmental harm, that interest likely would outweigh the economic harm associated with delaying the project. But because Plaintiffs have not made that showing, this factor does not weigh in their favor.

**E.  Public Interest**

"Finally, our precedent requires that we examine the public interest in determining the appropriateness of a preliminary injunction. While we have at times subsumed this inquiry into the balancing of the hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected. The public interest inquiry primarily addresses impact on non-parties rather than parties." *Connaughton*, 752 F.3d at 766 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Plaintiffs argue that the public has a strong interest in avoiding irreparable environmental injury and in ensuring that the environmental impacts of federal projects are properly vetted prior to their going forward, as well as ensuring that federal officials act in accordance with the law. Mot. at 24. Weighing on the other side of the scale are very serious public safety concerns. Members of the public "frequently use these roads to obtain firewood and access campgrounds and for other recreational activities." Opp. at 21 n.12 (citing Elliott Decl. ¶ 11). Dead and dying trees may collapse on cars or people, resulting in death or serious injury, or may roll onto roadways after collapsing. Trees may cause damage to property by falling on roads or other infrastructure directly, or may damage or clog drainage structures, resulting in flooded roads. Unstable snags present a risk to firefighters, who would either subject themselves to serious risk to enter the area in the event of another fire or avoid the area completely. The snags themselves also present a fire risk, and removal of conditions "conducive to future high-severity fires" represents another public benefit. Finally, delaying the project may limit its potential future scope. Dead and dying trees deteriorate over time, resulting in structural degradation that may result in some portion of the trees presenting a risk of collapse too high for safe removal, resulting in a potential risk to public safety that may "persist for decades." Opp. at 22 (citing Elliott Decl. ¶ 22).

Environmental concerns represent a significant public interest, but weighed against Plaintiffs'

chances of demonstrating environmental harm on the merits, along with the very serious safety concerns related to removal of hazard trees near roads and recreation sites, the public interest tips strongly against granting the preliminary injunction.

## V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (ECF No. 10) is DENIED.

IT IS SO ORDERED.

Dated:   **November 16, 2017**          **/s/ Lawrence J. O'Neill**
                                        UNITED STATES CHIEF DISTRICT JUDGE