UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EARTH ISLAND INSTITUTE and SEQUOIA FORESTKEEPER,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**KEVIN ELLIOTT, in his official capacity as Forest Supervisor of the Sequoia National Forest, et al.,**<br><br>**Defendants,**<br><br>**and**<br><br>**SIERRA FOREST PRODUCTS, a California corporation,**<br><br>**Defendant-Intervenor.** | **1:17-cv-01320-LJO-SAB**<br><br>**MEMORANDUM DECISION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT, REQUEST FOR EXPEDITED CONSIDERATION, AND MOTION TO AMEND THE COMPLAINT**<br><br>**(ECF Nos. 39, 41, 42, 46, and 48)** |

## I. INTRODUCTION

Earth Island Institute and Sequoia ForestKeeper ("Plaintiffs") brought this suit against Defendant Kevin Elliott, in his official capacity as Forest Supervisor of the Sequoia National Forest, and the United States Forest Service ("USFS") (together, "Federal Defendants"), challenging the decision to authorize a logging operation along approximately 50.2 miles of road along the east side of the Greenhorn Mountains, outside the Giant Sequoia National Monument, without preparing an Environmental Assessment ("EA") for the project. Plaintiffs argue that the decision violates the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). Before the Court are the parties' cross-motions for summary judgment. ECF Nos. 39, 41, and 42. Plaintiffs also have

1

1   moved for expedited consideration of the cross-motions for summary judgment and for leave to file an

2   amended complaint.  ECF Nos. 46 and 48.  For the following reasons, Plaintiffs' motion to amend the

3   complaint is GRANTED, Plaintiffs' motion for summary judgment is DENIED, Federal Defendants'

4   motion for summary judgment is GRANTED, Defendant-Intervenor's motion for summary judgment is

5   GRANTED, and Plaintiffs' motion for expedited consideration is DENIED AS MOOT.

6                          **II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

7           This case involves a USFS fire salvage restoration project proposed and approved by the USFS

8   to treat a strip of land along an area of roadways affected by the Cedar Fire.  The Cedar Fire began on

9   August 16, 2016 and burned over 29,000 acres of mixed conifer and white fir forest, most of which was

10  in the Sequoia National Forest.  BR 168.[1]  The USFS is working to abate the hazards associated with

11  this burned area of forest, including through the "Bull Run" project, which is planned to involve felling

12  dead and dying trees along 50.2 miles of road along the east side of the Greenhorn Mountains, outside

13  the Giant Sequoia National Monument.  This project would treat up to 3,500 of the 29,000 acres in the

14  Cedar Fire burn area.  ECF No. 22-1, Declaration of Kevin B. Elliott ¶ 7.

15          Much of the USFS's reasoning regarding regulatory issues related to the Bull Run project is set

16  forth in a Revised Decision Memo, which outlines the proposed project as one designed to "mitigate the

17  hazards to public safety posed by the dead and dying trees along approximately 50.2 miles of road in the

18  project area," which consists of approximately 3,500 acres on the border of Tulare and Kern Counties,

19  roughly 30 miles southeast of Porterville, CA.  BR 1.  The project will abate hazard trees within 300 feet

20  of each side of the road.[2]  Hazard trees will be identified using Forest Service guidelines and will be

21  felled if they "could potentially strike within the road's clearing width, or could roll or slide into the

22

23  [1] The administrative record was lodged in paper form.  An index is available at ECF No. 33-2.  Citations to the administrative record will carry the prefix "BR."

24  [2] As the USFS explained in a letter dated November 30, 2016, the agency decided to abate hazard trees within 300 feet on either side of the road because the USFS's hazard tree guidelines state that hazard trees should be abated if the distance to the road is within a distance of one-and-a-half times a tree's height, and hazard trees as tall as 200 feet can occur within the

25  Cedar Fire area.  BR 645.

clearing after they fall." *Id*. at 2. Dead, dying, or damaged trees unlikely to fall into the road will not be felled unless they present a hazard to workers, and the memo is clear that the project "is not authorizing a 'clearcut' within 300 feet of road edges." *Id*. at 3. *See also* BR 208 (standing dead trees within the 300-foot buffer of the road "incapable of hitting the road prism would be left standing"). Felled trees will be removed if they "represent an obstruction to use and maintenance within the road's clearing width," if leaving the tree in place will increase fuel loading, or if removal is needed for the reforestation process. *Id*. Felled logs may be chipped or burned, and logs "considered to have commercial value may be sold as saw timber, cull logs, firewood, chips, posts, and poles," and branches and limbs may also be sold. *Id*. Some logs "will be left in place for habitat" and to meet the standard under the 2004 Sierra Nevada Forest Plan Amendment for down woody material retention. *Id*. Finally, the project will include activities to restore organic ground cover and to reforest the habitat, including planting seedlings, scattering seeds, and increasing organic ground cover by scattering limbs, branches, and chips. *Id*.

Pursuant to NEPA, 42 U.S.C. § 4332, the USFS undertook an analysis of the Bull Run project's potential effects on wildlife in an 86-page Biological Evaluation ("BE"), BR 157, and a 30-page Biological Assessment, BR 127. It also consulted with the U.S. Fish and Wildlife Service, which produced a 22-page Biological Opinion concerning the potential impacts of the project on species listed under the Endangered Species Act). BR 72. Under NEPA, proposed agency action need not be subject to further analysis through an Environmental Impact Statement ("EIS") or EA "if there are no extraordinary circumstances related to the proposed action" and the action fits into a categorical exclusion ("CE"), a category of action that the agency has determined does not have significant effects on the environment. 36 C.F.R. § 220.6. The USFS determined that the project fit into three CEs, for road repair and maintenance (CE-4), timber stand and/or wildlife habitat improvement activities (CE-6), and post-fire rehabilitation activities (CE-11). BR 3-4; 36 C.F.R. § 220.6(d)(4), (e)(6), (e)(11).

The USFS also determined that there were no extraordinary circumstances related to the project

that would trigger further review through an EIS or EA pursuant to NEPA.  Before approving a project under an agency-adopted CE, an agency must examine whether a particular project presents "extraordinary circumstances in which a normally excluded action may have a significant environmental effect."  40 C.F.R. § 1508.4.  A determination as to the significance "requires considerations of both context and intensity."  40 C.F.R. § 1508.27.  The agency is directed to examine "the degree of the potential effect of a proposed action on" things such as "Federally listed threatened or endangered species" or "Forest Service sensitive species."  36 C.F.R. § 220.6(b).  The USFS did not find that the Bull Run project would have significant adverse impacts to the Pacific fisher or California spotted owl ("CSO") that would require the project to undergo further NEPA analysis.

The Pacific fisher is a "sensitive species"[3] but is not endangered or threatened.[4]  BR 161.  There are "no [fisher] den sites in the project analysis area," BR 204, and research in the Sierra National Forest has shown that fishers do not use "high severity burn areas" at least in the immediate aftermath of a fire, though there is "some evidence of limited foraging occurring along the burn edge."  BR 210.  Fishers appear to favor "landscapes with more contiguous, unfrequented forests and less human activity" and are negatively associated with road density.  BR 203.  Fisher are forest-interior species, and habitat near roads represents "represent lower habitat quality due to disturbance related influences, habitat fragmentation, edge effects and collisions."  BR 210.  The existence of roads has already affected the

---

[3] The BE considered "in detail" the potential impacts associated with the Bull Run project on six "terrestrial species of concern . . . [to] determine whether the proposed action would contribute to a trend toward any Forest Service sensitive species becoming federally listed."  BR 161.   It noted that the Forest Service Manual and Sequoia Forest Land and Resource Management Plan ("LRMP"), as amended by the Sierra Nevada Forest Plan Amendment Final Environmental Impact Statement, ensure "through the biological evaluation process that all sensitive species receive full consideration in relation to proposed activities."  BR 161-62.  The BE further stated that governing law, regulations, and the Forest Service Manual provide "[d]irection to maintain the viability of Region 5 sensitive species" and that the Sequoia National Forest LRMP "provides general direction to utilize administrative measures to protect and improve the status of sensitive wildlife species."  BR 162.

[4] On October 7, 2014, the Fish and Wildlife Service proposed to list the West Coase Distinct Population Segment of fisher as a threatened species under the Endangered Species Act.  79 Fed. Reg. 60419 (Oct. 7, 2014).  After further analysis of "the best scientific and commercial information available" and over multiple public comment periods, the Fish and Wildlife Service withdrew the proposed rule, concluding that the fisher "does not meet the statutory definition of an endangered or threatened species because the stressors potentially impacting the proposed DPS and its habitat are not of sufficient magnitude, scope, or imminence to indicate that the DPS is in danger of extinction, or likely to become so within the foreseeable future."  81 Fed. Reg 22710, 22710 (Apr. 18, 2016).

canopy cover in the area, BR 208, and the project "focuses its efforts to encompass areas of highest burn severity where low canopy cover and structural attributes needed for resting and denning activity are no longer present." BR 210. The BE determined that the fire reduced "large woody debris" in many areas and that the project's features to retain large woody debris would increase high-quality habitat to "improve complexity and structure at the forest floor" and promote a diversity of prey for the fisher. BR 209-10. "Dead or dying trees can provide resting and denning habitat for fisher." BR 210. While acknowledging that the removal of some hazard trees "could remove a den or rest tree for the fisher," the project would retain over 200,000 conifer-dominated snags greater than 15 inches DBH[5] in the project area, a figure that includes snags in untreated areas "as well as an average of four snags per acre retained in treated areas according to the design criteria." BR 210.

In addition to the comments they submitted during the comment period, BR 385, Plaintiffs submitted supplemental comments concerning the potential effects on fisher habitat connectivity, BR 320. Plaintiffs argued that the Bull Run project is similar to the Rancheria project, where the USFS ordered a supplemental NEPA analysis in light of concerns about "habitat fragmentation and loss of connectivity caused by the Cedar Fire." BR 323. They contended that the USFS undertook no supplemental analysis to ensure that the fisher population in the Southern Greenhorn Mountains was not isolated in the wake of the fire. *Id*.

Like the Pacific fisher, the CSO is sensitive but not endangered or threatened. BR 161. Also like the Pacific fisher, the CSO is a forest-interior species that is less likely to nest near roads. BR 210. The USFS undertook an analysis of the potential effects on the CSO, examining metrics including total available habitat and acres treated; estimated changes in structural characteristics of the habitat, such as canopy, snags, and large woody debris; disturbance effects; and the number of acres treated of certain

---

[5] DBH stands for "diameter at breast height."

habitat types and changes in percentage of relative habitat. BR 207. Field surveys conducted in the last three years identified four CSO territories near the project area. Two of the four CSO territories near the project area have minimal overlap with the planned area, BR 182-83, a third has likely been abandoned, BR 184-85, 212, and the fourth[6] will have a monitor on site for any felling during the project, and if nesting owls are present, the project will be subject to a limited operating period, BR 166. Like the Pacific fisher, CSOs nest away from roads, and CSO habitat near roads is lower quality. BR 210. Accordingly, the USFS found that the Bull Run project would have limited disturbance effects and be unlikely to result in significant losses of live foliage and canopy, strong habit factors for CSO. BR 212.

With respect to CSO, Plaintiffs submitted during the comment period an evaluation prepared by Chad Hanson, Ph.D., a member of Plaintiff Earth Island Institute, that included supplemental comments and summaries of additional studies, which he believed to show that even low levels of post-fire logging within 1,500 meters of territory centers show "severe adverse impacts" on CSO occupancy. Pls.' MSJ at 23 (quoting BR 312).

The USFS issued the initial Decision Memo, BR 14, on August 30, 2017. The Decision Memo stated that the project was categorically excluded from further NEPA review under the CE for timber stand and/or wildlife improvement activities and the CE for post-fire rehabilitation activities. BR 17-17. Plaintiffs filed suit on September 29, 2017, contending that the Bull Run project violated NEPA by relying on CEs rather than preparing an EA or EIS and by failing to explain why the Bull Run project will not have significant effects on species in the area. ECF No. 1. On October 4, 2017, the USFS issued a Revised Decision Memo, which added the road-maintenance CE to the list of CEs the USFS intended to rely on. Plaintiffs moved for a preliminary injunction on October 9, 2017, ECF No. 10, which the Court denied in a written order dated November 17, 2017, ECF No. 29.

---

[6] This is the TUL0036 owl territory.

# III. LEGAL STANDARD

## A. NEPA

NEPA requires that federal agencies prepare "a detailed statement by the responsible official on . . . the environmental impact" of any federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185. "NEPA is a procedural statute," designed to ensure "that federal agencies take a 'hard look' at the environmental consequences of their proposed actions before deciding to proceed." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (quoting *Methow Valley*, 490 U.S. at 350-51). "Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making." *Id.* (citing *Methow Valley*, 490 U.S. at 350). "A court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Id.* (internal citations omitted).

## B. APA

The APA's, 5 U.S.C. §§ 701-06, standard of review applies to Plaintiffs' NEPA claim. *San Luis v. Jewell*, 747 F.3d at 601. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> ***

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or]

(D) without observance of procedure required by law[.]

\*\*\*

*Id.* § 706(A).  When assessing claims pursuant to the APA, a court, reviewing only the AR, must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  In other words, a court's "review is guided by whether the agency's analysis is reasonable and offers sufficient detail to ensure that environmental consequences have been fairly evaluated."  *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (citations and quotation marks omitted).

A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977).  Although a court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and a court may not substitute its judgment for that of the agency.  *Id.* at 415-16.

Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005).  A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  As the Ninth Circuit explained in *River Runners*:

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish &*

8

> *Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*River Runners*, 593 F.3d at 1070. Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). In particular, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

But "the deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *id.* (internal citation and quotation omitted), and courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area. *See, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA . . . ." *Id.* The Ninth Circuit has held that "[t]he [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Id.* (quotation and citations omitted). The APA does not allow a reviewing court to overturn

an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Id.* This is especially true in the context of management of USFS lands, for Congress has consistently acknowledged that the agency must balance competing demands in managing National Forests. *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

**C.** **Summary Judgment**

Under the APA, the district court's review of an agency's decision is usually limited to the administrative record. 5 U.S.C. § 706; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden variety civil suit," but rather "sits as an appellate tribunal"). Therefore, the usual "genuine dispute of material fact" standard for summary judgment normally does not apply in an APA case. *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011). When reviewing an administrative decision under the APA, there are normally no "disputed facts that the district court must resolve." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did*." Id.; see also City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770.

## IV. ANALYSIS

**A.** **Motion For Leave To File Amended Or Supplemental Complaint**

Before proceeding to the merits of the parties' claims, the Court must first resolve an issue concerning the scope of the claims presented. Federal Defendants argued for the first time in their reply brief that the Complaint does not address the road-maintenance CE, which was added to the Revised Decision Memo after the Complaint was filed but before Plaintiffs moved for a preliminary injunction. Fed. Def. Reply at 2 (citing Complaint ¶ 79). Plaintiffs, "in an abundance of caution simply to make

10

sure that the pleadings conform to the issues already argued by the parties in briefing," Reply in Support of Mot. to Amend Complaint at 1, moved to amend or supplement the complaint to add reference to the USFS's addition of the road-maintenance CE to the decision memo.  See ECF No. 48-1, ¶¶ 38 (adding two sentences to reflect the addition of CE-4 to the Revised Decision Memo), 79 (adding text of CE-4), and 89 (adding reference to CE-4).  Defendants opposed Plaintiffs' motion.  Defendants first argue that Plaintiffs' reliance on Federal Rule of Civil Procedure 15(b)(2), which allows amendment of the pleadings for issues tried by consent, is misplaced because the rule only applies during or after trial, and no such trial has taken place here.  Second, they argue that permitting Plaintiffs to file an amended complaint after the period provided in the scheduling order requires a showing of good cause under Rule 16(b)(4), which Plaintiffs did not address in their motion.

"Where plaintiffs fail to raise a claim properly in their pleadings, if they raised it in their motion for summary judgment, they should be allowed to incorporate it by amendment under Fed. R. Civ. P. 15(b)."  *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (citations, internal quotation marks, and alterations omitted).  By the same token, "when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, the district court should have construed the matter raised as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time."  *Id.*  "Leave to amend shall be freely given when justice so requires, Fed. R. Civ. P. 15(a), and this policy is to be applied with extreme liberality."  *Id.* (citations, internal quotation marks, and alterations omitted).[7]  "Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of

---

[7] Rule 15(a) is titled "Amendments Before Trial" and provides that a party may amend a pleading once as a matter of course under certain enumerated circumstances.  "In all other cases," a party requires the court's leave to amend, which "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Rule 15(b) is titled "Amendments During and After Trial" and provides in relevant part that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."  Fed. R. Civ. P. 15(b)(2).

amendment, and whether the plaintiff has previously amended the complaint." *Id.* (quoting *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)). The factors do not carry equal weight; prejudice to the opposing party is the most important. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

*Desertrain* involved a constitutional challenge to a city ordinance prohibiting the use of vehicles as living quarters. The plaintiffs challenged the ordinance under the U.S. and California Constitutions and various state and federal statutes. The complaint alleged that the challenged ordinance violated due process but did not allege that it was unconstitutionally vague. After the close of discovery and shortly before the filing of cross-motions for summary judgment, plaintiffs' counsel informed defense counsel that they planned to challenge the ordinance of vagueness grounds, and the parties subsequently briefed the issue in their cross-motions for summary judgment. The district court declined to address the vagueness challenge because it was absent from the operative complaint. The Ninth Circuit held that the court should have construed the vagueness argument as a motion to amend the complaint and that the refusal to consider the merits of the vagueness claim was an abuse of discretion. In so doing, it cited both Federal Rule of Civil Procedure 15(a) and 15(b). Today, Rule 15(a) applies to "Amendments Before Trial," while Rule 15(b) applies to "Amendments During and After Trial." The Ninth Circuit quoted cases[8] that cited Rule 15(b) prior to the 2007 amendments to Rule 15. *Nat. Res. Def. Council v. Pruitt*, No. 16-CV-02184-JST, 2017 WL 5900127, at *5 n.4 (N.D. Cal. Nov. 30, 2017). Rule 15(a) prior to that time covered "Amendments," and Rule 15(b) applied to "Amendments to Conform to the Evidence." *Id.* Under the current rules, Rule 15(a) appears to be the more appropriate vehicle under

---

[8] The cited cases are *Jackson v. Hayakawa*, 605 F.2d 1121, 1129 (9th Cir. 1979) (reversing grant of summary judgment on claim raised for the first time in motion for summary judgment and holding that motion for summary judgment should have been construed as motion to amend); *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir. 1994) ("The complaint, however, does not control the issues properly before this court. We have held previously that, when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, '[t]he district court should have construed [the matter raised] as a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time.'") (quoting *Johnson v. Mateer*, 625 F.2d 240, 242 (9th Cir. 1980)).

which to analyze the issue, as there is no and has not been any trial, but the standards under either provision are comparable.[9]

Turning to the five factors, the Court finds that Plaintiffs have met their burden of demonstrating the propriety of the motion to amend. First, there is no evidence of bad faith. Second, the delay appears to have been the product of an oversight, and one that the Plaintiffs were not alone in failing to catch. Though the operative complaint did not mention CE-4, all parties litigated it at the preliminary injunction stage and again in the summary judgment briefing. There is no undue delay in raising the issue, and there will be no undue delay in litigating it. Third, there is no prejudice to Defendants. The operative complaint alleges that Federal Defendants failed to abide by NEPA because none of the categorical exclusions the USFS identified exempts the action from further NEPA review and that the USFS has failed to explain that the potential effects on certain species will be insignificant. After the USFS issued the Revised Decision Memo on October 4, 2017, the parties litigated the motion for a preliminary injunction, filed October 9, 2017, as if CE-4 were part of the complaint and fully briefed the cross-motions for summary judgment again as if CE-4 were part of the complaint until mentioning in two sentences in the Federal Defendants' reply brief that the central issue in the litigation was not actually among the CEs mentioned in the complaint. Where Defendants "had ample notice . . . and the issue did not require further discovery," then the parties "fully argued" the issue in their summary

---

[9] It is not clear whether *Desertrain* should be read to hold that a motion for summary judgment is the equivalent of a trial for purposes of determining what facts have been tried or whether it cited Rules 15(a) and 15(b) because they contain loosely equivalent standards. However it is read, the outcome is the same here, because, as one district court has explained, the standards under 15(a) and 15(b) are "substantially similar":

> Under Rule 15(b), a "court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b). Likewise, under Rule 15(a), "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Rule 15(a) is very liberal," *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006), and Rule 15(b) also "embodies a liberal policy in favor of allowing pleading amendments at any time during and even after trial." *United States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 804 (9th Cir. 2017) (quoting *Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 396 (9th Cir. 1983)).

*Nat. Res. Def. Council v. Pruitt*, 2017 WL 5900127, at *5 n.4.

13

judgment briefing, any claim of prejudice rings hollow. *Desertrain*, 754 F.3d at 1155. *See also Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1038 n.4 (9th Cir. 2016) ("a claim of prejudice is unpersuasive where defendants fully argued an issue in the summary judgment briefing"); 10A C. Wright & A. Miller, *Federal Practice and Procedure* § 2721 (3d ed. rev. 2014) ("the formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented by the other materials offered by the parties on the motion to determine whether the Rule 56 request should be granted"). Fourth, amendment would not be futile. Finally, Plaintiffs did not previously amend their complaint.

Accordingly, the five factors weigh in favor of Plaintiffs' being permitted to file the amended complaint.[10]

Defendants further argue that the motion to amend should be denied because Plaintiffs have failed to demonstrate that the "good cause" required to adjust a scheduling order under Rule 16(b).[11] Under that standard, "when a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party must satisfy the 'good cause' standard of Federal Rule of Civil Procedure 16(b)(4) , which provides that '[a] schedule may be modified only for good cause and with the judge's consent,' rather than the liberal standard of Federal Rule of Civil Procedure 15(a)." *Neidermeyer v. Caldwell*, 718 F. App'x 485, 488 (9th Cir. 2017). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth*

---

[10] Plaintiffs argue that their motion to amend the complaint was unnecessary because the Complaint already covers the issues being litigated – whether the USFS properly relied on CEs to avoid further NEPA review. The Ninth Circuit has held that where cross-motions for summary judgment cover an issue not strictly within the four corners of a complaint, the district court should treat the briefing as a motion to amend. *See Desertrain*, 754 F.3d at 1155. Nevertheless, Plaintiffs did file a formal motion to amend.

[11] The Rule provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

*Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

Defendants cite a number of cases in which courts declined to find that a plaintiff had satisfied the "good cause" standard under Rule 16(b) despite the liberal standard under Rule 15. In none of the cases cited, however, were the circumstances at all akin to the ones presented here. In *Johnson*, despite defendant's answer to the complaint and interrogatory responses disclaiming ownership of the resort at issue, and letter from defense counsel explicitly stating that the plaintiff had named the wrong defendant and offering to stipulate to substitution of the proper party, all within the period to amend the complaint, the plaintiff failed to move within the time set forth in the scheduling order to file an amended pleading. 975 F.2d at 609 ("Failing to heed clear and repeated signals that not all the necessary parties had been named in the complaint does not constitute diligence."). In *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000), the plaintiffs sought to add a new theory of liability after submitting their reply to the defendant's motion for summary judgment, despite having been in possession of the statistical report that served as the basis for the claim for over a year before filing summary judgment, and failed to offer any explanation for the failure to seek to amend the complaints earlier. In *Hansen v. Schubert*, 459 F. Supp. 2d 973, 1001 (E.D. Cal. 2006), the plaintiffs, who were the subject of a search warrant related to suspected tax evasion, claimed that the search violated their constitutional rights. Four years after the filing of the complaint, after the cross-motions for summary judgment had been decided and a few months before trial, the plaintiffs sought to add a new theory of liability to the case.[12]

Here, Plaintiffs are not belatedly seeking to amend the complaint to add a new theory. Instead, the theory remains that the USFS did not identify a viable CE to avoid further NEPA review and that it

---

[12] They had argued that there was no probable cause for the search warrant, that they were unlawfully seized during the course of the search, that the search had exceeded the scope of the search warrant, and that the officers had used excessive force during the execution of the search warrant. Only after the court had rendered its decision and order on the summary judgment motions did the plaintiffs seek to add the additional theory that the search warrant had been unconstitutionally broad. Defendant-Intervenor also cites *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986), a case that discusses amendment under Rule 15(a). Plaintiffs' counsel in that case admitted that bringing the new cause of action "was a tactical choice," and the district court found that late amendment would prejudice the defendant because it would require further discovery. *Id.*

incorrectly concluded that the project did not present any extraordinary circumstances. Unlike the cases Defendants cite, permitting the amended complaint will not upset an imminent trial date, require the reopening of discovery, or otherwise disrupt the orderly proceeding of the case. Once Federal Defendants pointed out that the operative Complaint did not cite one of the CEs at issue, Plaintiffs promptly sought to amend the Complaint to bring it into conformance with the issues the parties have briefed both in the present motion and in prior rounds of motions practice. Plaintiffs have thus demonstrated good cause.

**B.      Standing**

To establish standing, a plaintiff must demonstrate, "at an irreducible minimum," (1) that he personally suffered some actual or threatened injury (injury in fact); (2) that the injury can be traced to the challenged conduct of the defendant (causation); and (3) that the injury is likely to be redressed by a favorable judicial decision (redressability). *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 472 (1982). An association has standing to bring suit on its members' behalf if: "[1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc*., 528 U.S. 167, 169 (2000). In a case brought under the ESA or another environmental-protection statute, the requisite injury in the standing context needs to be to the plaintiff, not to the environment. *Id*.

In support of its motion for a preliminary injunction, Plaintiffs submitted declarations from two members who have visited the Bull Run project area in the past and intend to do so in the future. *See* ECF No. 10-5, Declaration of Ara Marderosian ¶¶ 7-12; ECF No. 10-4, Declaration of Dr. Chad Hanson ¶¶ 7-11. The Court found that Plaintiffs established that they had standing to bring this suit. Defendants do not challenge that finding or present facts that would suggest that Plaintiffs no longer have standing.

Accordingly, the Court finds, as it did in its order on the motion for a preliminary injunction, that

1  Plaintiffs have satisfactorily demonstrated that they have standing.

2  **C.    Mountain Yellow-Legged Frog And Spear Creek**

3          Federal Defendants argue that Plaintiffs have abandoned two of the claims raised in the

4  Complaint and in the motion for a preliminary injunction that are absent from Plaintiffs' summary

5  judgment papers: that the USFS failed to explain why the project's effects on the mountain yellow-

6  legged frog are insignificant and that USFS improperly segmented the Spear Creek project from the Bull

7  Run project.  Plaintiffs do not dispute that these claims are no longer active.  No party briefed those

8  issues in the cross-motions for summary judgment, and the Court does not consider them in this order.

9  **D.    Application Of The Road Maintenance Categorical Exclusion**

10         The CEs provide in relevant part that "[a] proposed action may be categorically excluded from

11 further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances

12 related to the proposed action and if" the action falls within one of the categories listed in § 220.6(d) and

13 (e).  36 C.F.R. § 220.6(a).  Section 220(d) includes categories of actions "for which a project or case file

14 and decision memo are not required," meaning that the responsible official has discretion to prepare a

15 supporting record and decision memorandum for the categories of actions listed there but is not required

16 to do so.  *Id.* § 220.6(d).  They include:

18         (4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but
           are not limited to:
19         (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS
           road;
20         (ii) Grading a road and clearing the roadside of brush without the use of herbicides;
           (iii) Resurfacing a road to its original condition;
21         (iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the
           trail; and
22         (v) Surveying, painting, and posting landline boundaries.

*Id.* § 220.6(d)(4).

23         Section 220(e) lists categories of actions "for which a project or case file and decision memo are

24 required."  *Id.* § 220.6(e).  They include:

(6) Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:
(i) Girdling trees to create snags;
(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;
(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and
(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

[. . .]

(11) Post-fire rehabilitation activities, not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds), to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire. Such activities:
(i) Shall be conducted consistent with Agency and Departmental procedures and applicable land and resource management plans;
(ii) Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and
(iii) Shall be completed within 3 years following a wildland fire.

[. . .]

(13) Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:
(i) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and
(ii) Harvest of fire-damaged trees.

*Id.* § 220.6(e)(6), (11), (13). The initial Decision Memo identified the CEs for timber stand and/or wildlife habitat improvement activities, *id.* § 220.6(e)(6) ("CE-6"), and for post-fire rehabilitation activities, *id.* § 220.6(e)(11) ("CE-11"). BR 16-17. The Revised Decision Memo added the road-maintenance CE, *id.* § 220.6(d)(4) ("CE-4"). BR 3.

Generally, "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Env't v. U.S. Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999). Furthermore, "an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent

with the terms used in the regulation." *Id.* The key question is whether the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion. *Id.* at 858.

Plaintiffs do not raise an objection to the use of CEs for the project's reforestation activities under CE-6 and CE-11. They take aim at the use of the road-maintenance CE for a timber sale. The crux of the dispute between the parties is whether the removal and commercial sale of hazard trees along 52.1 miles of road may properly be classified as "road maintenance." Among other things, Plaintiffs contend that CE-13 (quoted above) limits the acreage of any salvage operation the USFS may cover under a CE (and therefore exempt from normal NEPA requirements).

Plaintiffs principally rely on a 2008 case from the Central District of California, *Los Padres Forestwatch v. U.S. Forest Service*, No. CV-08-845-GW (MANx) (C.D. Cal. July 3, 2008), ECF No. 10-12, the only case that squarely addresses Plaintiffs' contention that CE-13 limits the acreage of salvage operations USFS may cover under a CE. The *Los Padres* decision, which is unpublished, rejected a plan similar to the one at issue here, where the USFS sought to rely on the road-maintenance CE for a project that included commercial salvage of dead trees near roads.

The *Los Padres* court found unreasonable USFS's conclusion that the commercial salvage of dead trees along roadsides fell under the road maintenance CE rather than the salvage CE, reasoning that the salvage CE limited the number of acres that could be treated through salvage operations under a CE. ECF No. 10-12, *Los Padres* slip opinion, at 15-19. The district court was unpersuaded by the USFS's argument that CE-13 did not apply to maintenance along roadsides because the major environmental effect occurred when roads went in, such that salvage activities near roadsides had different potential environmental effects than salvage away from roadsides. The court emphasized that the salvage CE has no restrictions concerning the <u>type</u> of land (roadside v. non-roadside) but does contain two other types of restrictions: (1) that no more than 250 acres be affected and (2) that there be "no more than ½ mile of temporary road construction." *Id.* at 16 n.19. *Los Padres* concluded that because the agency determined

that acreage <u>does</u> matter when undertaking salvage logging, the agency is not free to ignore that determination by selecting a different CE that makes no mention of salvage logging.

However, other district-court opinions both predating and postdating *Los Padres* upheld the use of the road-maintenance CE in similar circumstances. In *Native Ecosystems Council v. Krueger*, No. CV 13-167-M-DLC, 2014 WL 9954189, at *10 (D. Mont. June 4, 2014), the court granted summary judgment to the USFS in a case involving the commercial salvage of fire-damaged hazard trees along roadways. At issue was the USFS's authorization of the removal of dead or dying fire-damaged hazard trees along 15 miles of existing roads in the Gallatin National Forest. Salvage logging of hazard trees was permitted within 150 feet of roads and was planned to occur on approximately 300 acres of burned land but could affect up to 730 acres. The district court held that the USFS's determination that the project fell within the road-maintenance CE was not clearly erroneous:

> Here, the Forest Service determined the Project fell within the categorical exclusion for "[r]epair and maintenance of roads." 36 C.F.R. 220.6(d)(4). The Project authorizes removal of trees within 150 feet of roads "based on . . . consideration of whether the tree is expected to fall onto the roadway or cause another tree to fall into the roadway." A–1:1–2, 6. The Decision Memo explains that "the purpose of this hazard tree removal proposal is to provide for safety of road users and maintenance of the roads within the Millie Fire perimeter." *Id.* at 1. Contrary to Plaintiffs' assertion, the Project does not authorize a free-for-all of commercial logging on hundreds of acres of land, but allows only removal of "hazard tree[s]" within 150 feet of roads based on specific considerations in order to alleviate a situation in which "sliding, falling and rolling trees landing in the roadway [will] create [ ] snag hazards and roadway blockages." *Id.* To minimize potential impacts, mechanized equipment will be required to stay on the roads and all tree removal activities will be done by hand felling. *Id.* at 19.
>
> The Forest Service reasonably concluded that the Project fell within the categorical exclusion for road maintenance. *See Forest Conservation Council v. USFS*, 2003 WL 23281957 (D. Ariz. July 9, 2003) *aff'd* 110 F. App'x 26 (9th Cir. 2004) (holding that "removal of dead trees within 150 feet of fences is generally within the scope of the repair and maintenance of roads, trails, and landline boundaries"). Under the circumstances, removing hazard trees within 150 feet of these roads is consistent with the categorical exclusion for road maintenance.

*Native Ecosystems Council*, 2014 WL 9954189, at *10.

The district court in *Forest Conservation Council v. U.S. Forest Serv.*, No. CV-03-0054-PCT-FJM, 2003 WL 23281957, at *3 (D. Ariz. July 9, 2003), *aff'd*, 110 F. App'x 26 (9th Cir. 2004), also

addressed the use of the road-maintenance CE for commercial salvage activities, but unlike *Native Ecosystems Council*, it addressed the salvage CE as well. The challenged project would have allowed salvage logging on approximately 15,000 acres within 500 feet of the boundaries of administrative sites, developed recreation sites, and identified concentrated use areas; within 200 feet of the center line of highly traveled roads open to motor vehicle traffic; and within 100 feet of the center line along heavily used forest system trails. *Id*. Another aspect of the project would remove dead trees within one-half mile of private land boundaries on 19,364 acres of land. *Id*. The court held that while it would not necessarily have determined *de novo* that hazard tree removal obviously fell under the umbrella of road maintenance, the "plainly erroneous" standard of review controlled:

> The application of these three categorical exclusions to the roads and trails decision is not immediately obvious. Removing dead trees within 500 feet of the boundaries of administrative sites can generally be said to relate to administrative sites. But the examples given (e.g., mowing lawns, replacing roofs) are far more modest than removing dead trees within a 500 foot swath. Similarly, removing dead trees within 200 feet of roads and 100 feet of trails relates generally to the repair and maintenance of roads and trails. Again though, the examples given are far more modest than the action proposed here (grading a road, pruning vegetation). And, removing dead trees within 500 feet of recreation sites generally relates to the repair and maintenance of recreation sites and facilities. But again, the examples given are far more narrow (applying insecticides and repaving a parking lot). If we were deciding this issue *de novo*, we might have concluded that the action proposed by the roads and trails decision, while within the general description of the categorical exclusions, is far more expansive than the examples given and thus the exclusions would not apply. But we are not reviewing this *de novo*. We must give the agency's interpretation controlling weight unless it is plainly erroneous or inconsistent with the terms used in the categorical exclusion. We cannot say that the agency's interpretation here is inconsistent with the terms used in the categorical exclusion. There is rough comparability. For example, the major environmental impact occurred when the roads went in. We thus cannot say that the agency's interpretation is plainly erroneous.

*Id*. at *3; *see also id*. ("The removal of dead trees within 150 feet of fences is generally within the scope of the repair and maintenance of roads, trails and landline boundaries."). The court held that the project's proposed removal of dead trees within a half mile of private land boundary did not fall within the ambit of the CE for "Timber stand and/or wildlife habitat improvement activities which do not include the use of herbicides or do not require more than one mile of low standard road construction." Neither the plain terms of the CE nor the enumerated, though non-exhaustive, examples supported this

portion of the project. In evaluating the application of the habitat improvement CE, the *Forest Conservation Council* decision addressed whether the salvage CE would apply, because it "specifically addresses timber harvest and salvaging wood from dead or dying trees." But, as the district court noted, the USFS did not rely on this categorical exclusion because its motivation was to create a fire break and because at the time that case was filed, the salvage CE had been invalidated by *Heartwood v. United States Forest Serv.,* 73 F. Supp. 2d 962 (S.D. Ill. 1999). But even if the salvage CE were operative, the court held that because the then-newly proposed salvage CE was capped at 250 acres, and the project at issue covered over 19,000 acres, it would not have applied. WL 23281957, at *3-4. The court nowhere suggested that the existence of the salvage CE would limit the use of other CEs or that the invalidation of the salvage CE meant that no salvage project could proceed under a CE.

The Court is persuaded that this project to maintain safe roadways can proceed under the road-maintenance CE. By its terms, the CE involves road maintenance, and abating hazard trees that may fall on a road fits within the general scope of the CE. In addition, the Forest Service Handbook itself states that removal of roadside hazard trees can fall under the road-maintenance CE. BR 709 ("Road maintenance includes mitigating danger tree hazards that threaten safe use of the forest transportation system."); BR 710 (stating that "[s]trategies utilizing the sale of forest products, including commercial timber sales and land stewardship contracts, may be employed to mitigate danger tree hazards along" roads; BR 711 ("Road maintenance, including mitigation of danger tree hazards, may be subject to a categorical exclusion from analysis and documentation in an environmental assessment or environmental impact statement under certain circumstances (36 CPR 220.6(d)(4); FSH 1909.15, sec. 31.12, para. 4).").

An agency's interpretation of its own regulations is entitled to deference. *See Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1199 (9th Cir. 2012). The Court cannot say that the USFS's decision to remove hazard trees that may damage roads – using the USFS Handbook's criteria for identification of road hazard trees – is plainly erroneous or inconsistent with the regulation.

### 1.    <u>**Agency Deference**</u>

Plaintiffs argue that any deference an agency is due dissolves when the agency's invocation of a CE is merely a *post hoc* rationalization rather than the product of considered agency action.  Courts do not grant deference to agency interpretations "if there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *California Pub. Utilities Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 975 (9th Cir. 2018) (citation omitted). "Indicia of inadequate consideration include . . . signs that the agency's interpretation amounts to no more than a convenient litigating position; or an appearance that the agency's interpretation is no more than a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Id.* (alteration in original) (quoting *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 829–30 n.4 (9th Cir. 2012) (en banc)).

Because the CE that Federal Defendants predominantly rely on is one that was absent from the initial Decision Memo and appeared in the Revised Decision Memo only *after* Plaintiffs filed their Complaint, Plaintiffs conclude that the Federal Defendants' decision to rely on CE-4 to avoid further NEPA review is not entitled to the deference normally accorded agency interpretations of their categorical exclusions.  The road-maintenance CE, however, did not appear for the first time in the Revised Decision Memo.  In a letter to the project file dated January 19, 2017, District Ranger Eric La Price wrote that he had consulted the Forest Leadership Team that day and that Forest Supervisor Kevin Elliott agreed with his proposal to use CEs for the project.  Noting that the felled hazard trees would "present a fire hazard along the road corridors" and prevent reforestation efforts, he stated that "excess logs would be chipped, piled and burned or sold to remove them from the area." BR 273.  He identified road maintenance and timber stand as appropriate CEs for the proposed project, BR 273, writing that "[t]he actions we are proposing are routine in nature and the effects are well known.  With a reasonable degree of certainty, I do not foresee any reasonable potential for significant individual or cumulative effects." BR 274.  He noted that if the USFS identified anything during the scoping or analysis that

would present an extraordinary circumstance, he "would upgrade the analysis as appropriate." *Id.*

In response to an email from an officer in EPA's Enforcement Division, NEPA Section, Mr. La Price wrote on February 14, 2017, that while the USFS was in the process of determining the appropriate level of analysis, "based on the activities proposed and anticipated effects, we are leaning towards the use of a categorical exclusion." BR 474. In an email the following day responding to an inquiry whether the USFS intended to do an EA,[13] Mr. La Price declined to speculate about "what may come up in this round of scoping and how it may affect how we perform our analysis or under which authority we may use. We will make a decision on the level of analysis at the appropriate time. If we decide to use a CE, we will clearly identify the category." BR 471. On February 17, 2017, Irina Ford, a Forest Planner, wrote to Mr. La Price and others that "Bull Run Creek is one of the two priority watersheds" in Sequoia National Forest and suggested that the timber-stand CE might be used to restore the watershed. BR 265. In the Project Initiation Letter issued four days later, on February 21, 2017, Mr. La Price identified that the twin goals of the project were "to mitigate the hazard to public safety posed by the dead and dying trees along roads in the Cedar Fire area and to perform reforestation work in the area," BR 267, and wrote that "[b]ased on the current issues and anticipated effects, the Responsible Official has decided we will begin analyzing this proposal as one that can be excluded from documentation" through use of a CE. BR 268. In a Project Initiation Input Request Form also dated February 21, 2017, the USFS identified the timber stand or wildlife habitat improvement CE in the entry for the level of NEPA review (CE-6). BR 257. Though it identified the Forest Service Handbook's command to keep roadways safe for passage, including through "identification and mitigation of danger trees,"[14] and discussed the potential harm to roads or danger to travelers if the hazard trees were not

---

[13] The interested party making the inquiry was counsel for Plaintiffs.
[14] "According to the Forest Service Handbook (FSH 7709.59), roadways must be managed for safe passage by road users. This includes management of hazards associated with roadside vegetation, including identification and mitigation of danger trees. Safety is the predominant consideration in road operation and maintenance and takes priority over biological or other considerations." BR 258.

removed, it did not cite the road-maintenance CE. BR 258. The cited section of the Forest Service Handbook states that removal of roadside hazard trees can fall under the road-maintenance CE. BR 709 ("Road maintenance includes mitigating danger tree hazards that threaten safe use of the forest transportation system."); BR 711 ("Road maintenance, including mitigation of danger tree hazards, may be subject to a categorical exclusion from analysis and documentation in an environmental assessment or environmental impact statement under certain circumstances (36 CPR 220.6(d)(4); FSH 1909.15, sec. 31.12, para. 4).").

In addition to discussions of the use of the road-maintenance CE during project scoping, Federal Defendants also point out that the USFS has repeatedly relied on the road-maintenance CE for projects like this one over many years, which is why it has been the subject of a number of lawsuits. *See Forest Conservation Council v. U.S. Forest Serv.*, No. 03-54, 2003 WL 23281957 (D. Ariz. July 9, 2003); *Los Padres*, ECF No. 10-12; *Native Ecosystems Council v. Krueger*, No. 13-167, 2014 WL 9954189 (D. Mont. June 4, 2014).

The decision to rely on the road-maintenance CE is therefore unlike the cases on which Plaintiffs rely to argue that the USFS decision is undeserving of deference. Unlike those cases, the agency here did consider and eventually decide to rely on the CE at issue. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("[W]e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has *articulated no position on the question*, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.'") (emphasis supplied) (citation omitted); *California Pub. Utilities Comm'n*, 879 F.3d at 975 ("FERC never before explicitly articulated the interpretation it relies on"); *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("It is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is *no contemporaneous documentation* to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision. Post hoc

invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made.") (emphasis supplied); *Ctr. For Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1183 (D. Haw. 2006) ("The court could find *nothing in the administrative record* to indicate that APHIS considered NEPA when deciding whether to issue the four permits. . . . At a bare minimum, an agency must state—at the time it engages in the action in question (and not just when engaged in subsequent litigation)—that it is invoking a categorical exclusion.") (emphasis supplied).

The USFS issued the Revised Decision Memo months before the project was to begin and more than nine months after the agency first raised the possibility that it might rely on that CE. This is not a case of an agency's counsel raising in the context of a lawsuit a justification in the first instance. Instead, the agency itself relied on the CE in a Revised Decision Memo after the Plaintiffs filed their Complaint. As Defendants point out, the USFS did not need to issue any decision memo to invoke CE-4. 36 C.F.R. § 220.6(d). Plaintiffs have pointed to no case holding that an agency's decision to continue to analyze the project, even after the initiation of a lawsuit but before the project has begun, strips away the deference that agency interpretations of their regulations are accorded.

### 2. Use Of A "Minor" CE

Plaintiffs next argue that the road-maintenance CE is among the CEs under the (d) subheading, which in their view covers "actions so minor that they do not even need a Decision Memo" and are thus inappropriate to read as having the "'broad' scope as argued by the agency here." Pls.' Reply at 2-3. Plaintiffs quote agency regulations stating that "[w]hile some Forest Service categorical exclusions of limited scope do not require a decision memo or project record, a majority of the Forest Service's categories do require preparation of a decision memo and a supporting record." 73 Fed. Reg. 43084, 43091 (July 24, 2008).[15] As further support, Plaintiffs also point to a district court decision describing a

---

[15] The regulation published the CEs and procedures from the Forest Service Manual and Forest Service Handbook in the

different CE, "the 'repair and maintenance of recreation sites and facilities' categorical exclusion," as one "typically intended for more minor projects associated with ordinary maintenance." *Wilderness Watch v. Iwamoto*, 853 F. Supp. 2d 1063, 1077 (W.D. Wash. 2012) (holding that where USFS relied on decision memo addressing rehabilitation of fire lookout instead of "new 'dismantle, restoration, and reconstruction' plan" and the invoked CE concerned only repair and maintenance, failure to conduct EIS or EA, or at a minimum address "whether a category exclusion was applicable," was an abuse of discretion), *motion for relief from judgment granted*, No. C10-1797-JCC, 2012 WL 6766551 (W.D. Wash. Sept. 20, 2012).

Federal Defendants respond that the road-maintenance CE is "limited" only in that activities along roads is a category circumscribed by the requirement that they take place along pre-existing roads, and thus "present fewer impacts than freestanding timber-harvest, fuels-reduction, and other activities in 36 C.F.R. § 220.6(e)." Fed. Defs.' Reply at 2-3. Plaintiffs' characterization of more minor and less minor CEs is unavailing. A CE's list of examples is not controlling, and courts are directed to examine whether the agency's interpretation is "plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr.*, 189 F.3d at 857-58 (finding that an agency's interpretation of a CE was not inconsistent or contrary to the language of the CE where it fit within the "general scope" of the terms of the CE).

### 3. Data Collected To Craft CE And Past Agency Practice

Plaintiffs argue that the data the USFS relied on to craft the CE and past agency practice both confirm that the USFS should have prepared an EA or EIS for this project instead of relying on a CE.

In creating CEs relating to timber harvest, 36 C.F.R. §§ 220.6(e)(12), (13), (14),[16] the USFS

---

Code of Federal Regulations.

[16] These CEs provide:

(12) Harvest of live trees not to exceed 70 acres, requiring no more than ½ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples

1 "reviewed 154 small timber sale activities which could potentially have been included in these

2 categories." 68 Fed. Reg. 44598, 44602 (July 29, 2003). The USFS requested that field units send "any

3 results from past monitoring efforts on the effects of": (1) projects performed under the old salvage CE,

4 (2) projects done with an EA or EIS but that fit the requirements of the old salvage CE, (3) were similar

5 in size and scope, or (4) if none existed, two or more randomly selected projects fitting the criteria. *Id.*

6 44603.

7 Plaintiffs argue that the inclusion of roadside maintenance projects in the set of studies used to

8 craft the timber CEs means that the USFS intended that roadside salvage projects must fall under those

9 CEs, not others, like the road-maintenance CE: "If the agency believed that roadside hazard salvage

10 projects had lesser impacts than other salvage projects, it would not have included them in the data set

11 since they would have improperly skewed the resulting acreage number, making it larger than it should

12 have been." Pls.' MSJ at 14. As this Court held in the Preliminary Injunction Order, "[t]he fact that

13 USFS cast a wide net to expand its sample size for determining an appropriate acreage limitation for

14 CE-13 does not change the legal analysis herein that concludes that nothing precludes USFS from

15 ————————————————

16 include, but are not limited to:
(i) Removal of individual trees for sawlogs, specialty products, or fuelwood, and

17 (ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and
vigor.

18 (13) Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary
road construction. The proposed action may include incidental removal of live or dead trees for landings,

19 skid trails, and road clearing. Examples include, but are not limited to:
(i) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road

20 to access the damaged trees, and
(ii) Harvest of fire-damaged trees.

21 (14) Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed

22 250 acres, requiring no more than ½ mile of temporary road construction, including removal of
infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the
spread of insects or disease. The proposed action may include incidental removal of live or dead trees for

23 landings, skid trails, and road clearing. Examples include, but are not limited to:
(i) Felling and harvest of trees infested with southern pine beetles and immediately adjacent uninfested trees
to control expanding spot infestations, and

24 (ii) Removal and/or destruction of infested trees affected by a new exotic insect or disease, such as emerald
ash borer, Asian long horned beetle, and sudden oak death pathogen.

25 36 C.F.R. § 220.6(e).

28

1  applying an overlapping CE to a project that might, if smaller in size, also qualify under CE-13." ECF

2  No. 29 at 15 n.5. *See also* 68 Fed. Reg. at 44603 (including in the group of data to craft the rule

3  randomly selected projects). In addition, Plaintiffs' argument that the USFS must only have intended to

4  include projects that would not fit under another CE is belied by the presence of the "Squaw Creek Fuels

5  Reduction" and "Loop Road Visuals/Fuel Reduction CE" projects in the dataset, both of which fall

6  under CE-10, the fuel-reductions CE. ECF No. 24-3 at 1, 4.

7       Plaintiffs also rely on two roadside hazard projects for which the USFS elected not to rely on the

8  road-maintenance CE as further evidence that reliance on that CE here is contrary to agency practice.

9  They first point to the Lucas Creek Project, a project in Sequoia National Forest that would "remove

10  hazard trees along roads and properties adjoining the Breckenridge Subdivision" and "also reduce fuels

11  build-up to protect the community and the Lucas Creek upper and middle watershed from high-intensity

12  fire." ECF No. 24-4. The project planned to treat 250 acres of land and invoked the salvage CE. *Id.*

13  The second is the Piute Roadside Hazard Project, a project involving a "commercial timber sale to

14  remove hazard trees for safety purposes along approximately 32 miles of roads affected by the 2008

15  Piute Fire," for which the USFS prepared an EA. BR 403. Neither of these examples is particularly

16  instructive. That the Lucas Creek Project proceeded under the salvage CE demonstrates only that a

17  project under 250 acres may be exempt from further NEPA review under the salvage CE, not that it

18  could not *also* fit under the road-maintenance CE. As discussed above, CEs may overlap; that the Lucas

19  Creek Project fit into one CE does not mean that it could not also have fit into another one. The Piute

20  Roadside Hazard Project is also not very edifying. That project included elements not present here, such

21  as "jackpot burning" (in areas where fuel loading exceeds 10 tons/acre) on 22 of the 32 miles of treated

22  land, which the EA describes as a process that "involves igniting concentrations of fuels on the forest

23  floor, whether they are natural fuels or fuels resulting from treatments." BR 404 n.3. It is not clear why

24  the USFS elected to proceed with an EA for this project. Indeed, the decision to prepare one is not

25  conclusive because "[a]n agency may decide in its procedures or otherwise, to prepare environmental

assessments for the reasons stated in § 1508.9[17] even though it is not required to do so."  40 C.F.R. § 1508.4.  Even if the project were in all respects similar, Plaintiffs point to nothing to mandate that the USFS's decision ten years ago to create an EA for a similar project requires that it proceed in the same manner here.

### 4.  Commercial Component Of Project

Plaintiffs argue that the commercial nature of the project brings it outside the scope of ordinary road maintenance.  Defendants respond that the Forest Service Handbook expressly states that road maintenance includes mitigation of tree hazards.  BR 709 ("Road maintenance includes mitigating danger tree hazards that threaten safe use of the forest transportation system."); BR 711 ("Road maintenance, including mitigation of danger tree hazards, may be subject to a categorical exclusion from analysis and documentation in an environmental assessment or environmental impact statement under certain circumstances (36 CPR 220.6(d)(4); FSH 1909.15, sec. 31.12, para. 4).").  In reply, Plaintiffs respond that they "have always acknowledged" that the road-maintenance CE includes mitigation of danger tree hazards but that it is the commercial timber sale aspect of the project that nudges this plan outside the scope of the CE.  Pls.' Reply at 9 n.3.  This is so, they argue, because the project involves more than "incidental tree felling to maintain a road," *id.*, but instead includes timber harvest, which brings "greater impacts than non-harvest hazard tree felling, from logging equipment and tree skidding,

--------------------------------------------------------

[17] This section governs the preparation of an EA:

Environmental assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

including adverse impacts to soils and aquatic systems, especially in a post-fire landscape, and the potential to leave insufficient woody material for wildlife purposes." Pls.' MSJ at 14. In short, they argue, leaving the felled trees on the ground is "the only hazard treatment allowed by" the road-maintenance CE, and Defendants "cannot deny the greater potential impacts from commercial logging vs. leave-it-in-place practices." Pls.' Reply at 10.

The text of the road-maintenance CE contains no such requirement that felled trees be left in place. In addition, the Forest Service Handbook, which, as Plaintiffs concede, discusses hazard-tree mitigation as part of road maintenance, itself contemplates that removed hazard trees might be subject to a commercial sale. *See* BR 710 (stating that "[s]trategies utilizing the sale of forest products, including commercial timber sales and land stewardship contracts, may be employed to mitigate danger tree hazards along" roads but noting that removal of high-priority danger hazard trees should not be delayed "to accommodate commercial removal of trees"); BR 711 ("Where strategies utilizing the sale of forest products are being employed to mitigate danger tree hazards before they become high priority, include in the project file an estimate by a qualified person of the month and year when high priority hazards are likely to occur. . . . All available methods for mitigation of danger tree hazards should be considered and applied as appropriate to local situations. These methods include but are not limited to commercial timber sales . . . ."). When it adopted the rehabilitation CE, 36 C.F.R. § 220.6(e)(11), the USFS received comments asking that the CE be modified to include "specific suggested activities such as fire and safety hazard tree removal, natural or mechanical soil rehabilitation, and rehabilitation of recreation sites." 68 Fed. Reg. 33814, 33821 (June 5, 2003). The USFS responded that removal of safety trees fell beyond the scope of the rehabilitation CE but squarely within the road-maintenance CE: "Safety hazard trees associated with roads, trails, recreation facilities, and administrative sites may be removed as part of routine maintenance of those facilities. . . . Most agencies already categorically exclude these maintenance activities from further analysis and documentation in an environmental assessment or

1  environmental impact statement." *Id.*[18]

2      Federal Defendants further object that imposing an extratextual leave-in-place limitation would

3  carry interpretive problems. If the commercial nature of the removal is the problem, it would seem to

4  exempt service contracts that did not involve subsequent sale of the timber. It is unclear if Plaintiffs'

5  proposed interpretation would permit branches of hazard trees to be removed and sold under a

6  commercial contract. Moreover, Plaintiffs advocate for a leave-in-place requirement while requesting

7  that the USFS be allowed "to move the trees to an area near where the tree is felled, within the project

8  area, so they do not otherwise create a hazard, such as moving or rolling into the road" until it has

9  complied with NEPA. Pls.' Opp. at 18. How far can a tree be moved before it is removed? Does

10  chipping or burning a tree count as removal? How many of a tree's branches can be removed before

11  running afoul of the leave-in-place requirement? The fuzzy boundaries inherent in Plaintiffs'

12  interpretation of the road-maintenance CE highlight the practical difficulties resulting from this

13  interpretation.

14      Even when invoking a categorical exclusion, an agency may address "extraordinary

15  circumstances in which a normally excluded action may have a significant environmental effect." 40

16  C.F.R. § 1508.4. Federal Defendants argue that there is no textual basis why Plaintiffs' concerns about

17  the environmental effects associated with salvage logging could not be addressed through an EA or EIS

18  where appropriate. Even reliance on a CE permits the USFS to examine an action further if there may

19  be a significant environmental effect, and that, not imposition of an extratextual requirement that there

20  be no commercial aspect to the roadside safety project, is the proper way to address Plaintiffs' concerns

21  about potential environmental effects resulting from the presence of heavy equipment and the possibility

22

23  _____

[18] Plaintiffs object that this statement did not state that removal would be done through a commercial sale and that it appeared
24  in the context of USFS's adoption of CE-10 and CE-11, not either the road-maintenance CE or the salvage CE, rendering it
   "high *dictum*." Pls.' Reply at 7. The statement was in the context of USFS's notice-and-comment rulemaking, which
   Plaintiffs agree is owed "full deference." Pls.' MSJ at 12. Though the statement appears in the adoption of a different CE, it
25  was a direct comment on the scope of existing CEs, and Plaintiffs offer no reason why the USFS's interpretation of its
   regulation should not be fully credited.

1    of tree skidding.  The Court agrees.

2           Federal Defendants' invocation of the road-maintenance CE to ensure that roads remain safe is

3    not plainly erroneous or inconsistent with the terms used in the regulation.

4    **E.     Finding Of No "Extraordinary Circumstances"**

5           Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of

6    NEPA compliance, albeit one that requires less than where an environmental impact statement or an

7    environmental assessment is necessary."  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096

8    (9th Cir. 2013).  However, USFS may rely on one or more CEs to avoid preparing an EA or EIS for a

9    project "only if there are no extraordinary circumstances related to the proposed action."  36 C.F.R.

10   § 220.6(a).  Extraordinary circumstances are those circumstances "in which a normally excluded action

11   may have significant environmental effect."  40 C.F.R. § 1508.4.  The Forest Service has identified

12   various "resource conditions" that should be considered in determining whether extraordinary

13   circumstances related to a proposed action warrant further analysis and documentation in an EA or an

14   EIS, 36 C.F.R. § 220.6(b)(1), including "Federally listed threatened or endangered species or designated

15   critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service

16   sensitive species," *id*. § 220.6(b)(1)(i).  The "mere presence" of one or more resource conditions does

17   not preclude the agency's use of CEs; "[i]t is the existence of a cause-effect relationship between a

18   proposed action and the potential effect on these resource conditions, and if such a relationship exists,

19   the degree of the potential effect of a proposed action on these resource conditions that determines

20   whether extraordinary circumstances exist."  *Id*. § 220.6(b)(2).  "NEPA regulations direct the agency to

21   consider the degree of adverse effect on a species, not the impact on individuals of that species."  *Envtl.*

22   *Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (citing *Native Ecosystems*

23   *Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("it does not follow that the presence

24   of some negative effects necessarily rises to the level of demonstrating a significant effect on the

25   environment")).

"When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr.*, 189 F.3d at 859. "Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr.*, 189 F.3d at 859.

## 1. **Pacific Fisher**

Plaintiffs contend that the USFS failed to explain why the potential adverse effects on the Pacific fisher are insignificant because it did not address habitat fragmentation and connectivity issues arising from the Cedar Fire. Plaintiffs complain that the BE was finalized on March 24, 2017, and that on April 12, 2017, the USFS issued a revised BE for the Rancheria Project, because it had determined that the Cedar Fire (located to the south of the Rancheria Project area) may have caused significant effects on the fisher, based on the habitat fragmentation and loss of connectivity. Pls.' MSJ at 19. Plaintiff Sequoia ForestKeeper submitted supplemental comments for the Bull Run project, raising concerns that the loss of habitat connectivity resulting from the Cedar Fire, in combination with the Bull Run and Spear Creek projects, could result in significant effects on the fisher population. The supplemental comments included a declaration from Dr. Chad Hanson, which raised concerns that the project might sever the fisher population south of the Cedar Fire area from the population in the project area. BR 323-24 (quoting BR 370-71). Isolating the already small population could restrict the gene pools of the subpopulations, "leading to increased inbreeding and poorer genetic health of the population." BR 324 (quoting BR 371). Plaintiffs claim that the USFS did not address these concerns.

As the Court explained in the Preliminary Injunction Order, the USFS ordered supplemental NEPA analysis for the Rancheria Project because the biological evaluation for that project had been completed in 2013, prior to the Cedar Fire, and the significant change in circumstances resulting from

the fire warranted an updated analysis. *See* ECF No. 22-9, Rancheria Supplemental Information Report, at 10 ("The habitat fragmentation and loss of connectivity caused by the effects of the Cedar Fire was not considered in the 2013 Fisher BE. This change in conditions may be significant and alter the conclusions made in the original determination for this project."). The Bull Run BE, by contrast, already considered the effects of the Cedar Fire. *See* BR 208 ("[T]his project is limited in its scope and its distribution across the landscape, and is not anticipated to dramatically contribute to further declines in habitat quality beyond what has already occurred with the 2016 Cedar Fire.").

The BE addressed a number of threats faced by the southern Sierra Nevada population of fishers. BE 201-04. This includes the threat of habitat fragmentation or loss of connectivity: "Habitat connectivity is a key to maintaining fisher within a landscape. Activities that result in habitat fragmentation or population isolation pose a risk to the persistence of fishers. Timber harvest, fuels reduction treatments, road presence and construction, and recreational activities may result in the loss of habitat connectivity resulting in a negative impact on fisher distribution and abundance." BR 203. The BE identified fuel reduction activities, effects of wildfire, land development, recreation, and roads as factors that could fragment, modify, or destroy fisher land. BR 201.

The BE stated that the mere presence of roads alone can result in habitat fragmentation and discussed studies concluding that fishers "favored landscapes with more contiguous, unfrequented forests and less human activity." BR 203. One study of sample units in the central and Southern Sierra Nevada region found that "fishers were negatively associated with road density." *Id*. Existing roads already create habitat fragmentation, BR 208, and the BE states that while the USFS is continuing to examine how fishers interact in post-fire areas, results so far "show that fisher do not utilize high severity bum areas at least initially post fire, with some evidence of limited foraging occurring along the bum edge." BR 210. The Bull Run project "focuses its efforts to encompass areas of highest bum severity where low canopy cover and structural attributes needed for resting and denning activity are no longer present." *Id*. There are "no den sites in the project analysis area." BR 204. Outside of the

"small linear strip of habitat (300 feet on each side of the road)," BR 208, snags will remain untreated, and even within the treatment area, the design criteria call for an "average of four snags per acre retained in the treated areas." BR 210. Despite being lower-quality habitat less likely to be used by fishers, the roadways in the project area "are not anticipated to be rendered unusable and will continue to provide for foraging and dis[per]sal activities to occur." BR 208.

Plaintiffs object that though the BE discussed habit connectivity and loss of fragmentation, it "is of a different kind from what is required." Pls.' MSJ at 21. They argue that the BE noted that while the existence of roads alone can result in the loss of habit connectivity, it does not address "the removal of most of the dead trees up to 300 feet from either side of the roads" and that the studies cited at BR 203 "discuss the effects of road density and vehicular traffic" rather than habitat connectivity or fragmentation *from logging*. Pls.' MSJ at 21. They further argue that the BE discussed the effects of existing roads and that the fire already degraded "many of the structural attributes of fisher habitat" but provides no insight into the further effects that the logging project will have. *Id*. The Court disagrees. The BE addressed these issues, including that the fragmentation effects already occurred when the road went in, and that the areas near the road are less likely to be fisher habitat. Plaintiffs have not demonstrated that their concerns that treatment of hazard trees in strips around existing roads will serve to further sever the fisher populations and create significant adverse effects on the species in the area.

Plaintiffs argue in reply that the BE acknowledges a potential shift in travel patterns lasting seven to ten years, which is "a long time, especially considering a fisher's 10-year lifespan." Pls.' Reply at 18. The BE's discussion of the potential shift in travel patterns was in a section addressing the effects of the fire itself:

> Habitat quality was greatly reduced for the California spotted owl, goshawk, bat species and the fisher from its existing condition due to stand replacing fire effects. These impacts resulted in increased tree mortality, decreased canopy cover, loss of multi-storied stand conditions, decreased levels of large down woody debris, shrub and herbaceous cover, and increased habitat fragmentation. Based on an analysis of suitable habitat pre and post fire, there has been an estimated 56 to 57% decrease in its availability across the landscape depending on the species considered.

> Current estimates of suitable habitat remaining by species are as follows: spotted owl 6,145 acres, northern goshawk 6,869 acres, bat species 6,231 acres, and fisher at 7,021 acres (Table 3). Habitat distribution and configuration may result in some shifts in travel patterns particularly for ground based species such as the fisher over the short term (7-10 years).

BR 208. The BE concluded in the same section that the project "is not anticipated to dramatically contribute to further declines in habitat quality beyond what has already occurred with the 2016 Cedar Fire." *Id.* It summarized that the project will "maintain or improve large woody debris and snags by retaining large logs and snags" in the road corridor that are unable to reach the road and retain all snags outside of the road corridor. BR 210. The project also has features designed to improve the habitat. *See* BR 209-10 ("The fire resulted in areas with high reductions of large woody debris . . . . This reduces habitat quality for species and their prey by decreasing hiding cover, and may result in shifts in prey species composition. While portions of the hazard trees felled would be removed, project design features have been included to retain large woody debris on the ground to benefit the species and their prey. . . . Actions to improve large woody debris distribution will improve complexity and structure at the forest floor and serve as hiding cover.").

Plaintiffs further argue that the BE does not address the stress from other projects in the area or the additional stress of tree mortality resulting from drought conditions or insects. These conditions were noted in the BE. *See* BR 168-69 ("This [habitat analysis] captured changes in habitat availability and its distribution due to an ongoing multi-year drought (2014-2016) and heightened insect activity resulting in high levels of tree mortality. The Cedar Fire began in August of 2016 and further greatly altered stand conditions and habitat availability."). Federal Defendants also point to a line from a paper submitted in Plaintiffs' supplemental comments in May 2017[19] that noted that while "[t]here is no available research or direct observations concerning how massive changes in tree cover due to drought and insect mortality . . . may affect fisher habitat use or population processes[,] . . . it is probable that

---

[19] Conservation Biology Institute, *Changed Circumstances and Implementation of the Southern Sierra Nevada Fisher Conservation Strategy, Note from the Authors* (March 2017).

37

maintaining[] and increasing the resilience of the remaining patches of large living conifers will be important to providing for the long-term persistence of the fisher population." BR 378. Removing excess fuel and thereby reducing the risk of fire to remaining healthy trees serves the fisher's long-term interest.

"Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions." *Norton*, 311 F.3d at 1177. Even assuming that Plaintiffs have put "substantial evidence" in the record, the USFS has adequately explained why there are no significant effects on the fisher and no exception to the use of a CE applies.

### 2. **California Spotted Owl**

Federal Defendants summarize the USFS's examination of the effects of the Bull Run project on the CSO as "a detailed, quantitative analysis" that "used multiple metrics, such as (1) total available habitat and acres treated; (2) estimated changes in important structural characteristics, such as canopy, snags, and large woody debris; (3) disturbance effects; (4) acres treated in suitable CWHR Forest Types, and change in relative percent of suitable habitat at the PAC scale, within a 0.727-mile radius, and within a 1.5 mile radius." Fed. Defs.' MSJ at 16 (citing BR 207, Table 8). The USFS also discussed scientific research relating to wildfire and post fire logging. BR 188-90.

Plaintiffs argue that the USFS failed to explain why adverse effects on the CSO are insignificant. They argue that they do not ask the Court to resolve any scientific disagreements but instead argue that the USFS "has simply failed to consider or analyze Plaintiffs' legitimate concerns regarding the potential loss of occupancy based on scientific studies they presented to the" USFS. Pls.' MSJ at 22. In particular, Plaintiffs argue that the USFS failed to address an evaluation prepared by Chad Hanson, a member of Plaintiff Earth Island Institute, that included supplemental comments and summaries of additional studies that he concluded "shows severe adverse impacts on California spotted owl occupancy from post-fire logging within a 1,500-meter radius of territory centers—even at levels that may seem

relatively low to some (5-25%)." Pls.' MSJ at 23 (quoting BR 312). The owls living at TUL0036[20] continue to occupy their territory, and Plaintiffs argue that the USFS did not address "what will happen to the owls after roughly 20% of their territory is logged." *Id*. The BE itself discussed one study that found that postfire salvage logging reduced occupancy 4.6% compared to postfire sites without salvage logging. *Id*. (citing BR 190). Plaintiffs argue that without any agency discussion to defer to, deference to agency expertise on the topic is inappropriate.

Defendants respond that Dr. Hanson's letter is not peer-reviewed, does not explain what type of post-fire logging he examined (i.e., whether it represents low-quality habitat near roads or wider salvage efforts), and treats 5-25% as a single imprecise category that potentially blurs the effects of different treatment levels. In any case, the USFS cited other published studies finding "no statistically significant effects of wildfire or salvage logging on California spotted owls in the mountains of southern California." BR. 190.

The parties disagree about the importance of CSO territory TUL0036. Federal Defendants emphasize that of the four CSO territories in the entirety of the project area, "only two have minor overlap with the roads, and the third has negligible habitat and is likely abandoned." Fed. Defs.' Reply at 7 (citing BR 184-85, 212-13). The fourth territory, TUL0036, includes segments of only three roads, and there is no nest within these roadside hazard removal zones. BR 183, 180, 185. Federal Defendants emphasize the BE's conclusions of little effect on the CSO's habitat in the area. BR 208 ("Treated roadways are not anticipated to be rendered unusable and will continue to provide for foraging and dis[pe]rsal activities to occur."); *id*. 212 ("As such, their removal is not anticipated to result in substantial losses of live foliage that contributes to overhead canopy, which is one of the strongest habitat factors selected for by the owl."); *id*. ("The road corridor itself previously impacted the habitat

---

[20] This refers to a site within the project territory that is a CSO territory.

and undergoes regular maintenance making it already a lower quality habitat (foraging and dispersal).").

Federal Defendants also highlight the mitigation efforts associated with the project to protect CSO habitat: "that higher levels of large woody debris be retained," that a wildlife monitor be on site for any felling in the protected activity center ("PAC"), and that a limited operating period be enforced if nesting owls are determined to be present in the area "in order to eliminate disturbance effects during peak times of the reproductive cycle."[21] BR 212, 166. They also argue that the Bull Run project will not log the entirety of the approximately 20% of TUL0036 that overlaps with the project area; only snags that could reach the road will be felled. Plaintiffs respond that they have not asserted that only clear-cut operations cause occupancy loss and that mitigations are irrelevant because "[o]nce occupancy is lost, these mitigations no longer make a difference." Pls.' Reply at 16.

The USFS did address the potential loss of CSO habitat. Plaintiffs attempt to reframe the issue as a failure to address "Plaintiffs' legitimate concerns with regard to the owls' loss of occupancy," Pls.' Reply at 16, but failure to credit their expert's work while relying on other published studies is not the same as a wholesale failure to address an issue. "Though the Forest Service did not perform the point-by-point type of counter-argument to experts that Plaintiffs appear to desire, our precedent makes clear that an agency 'need not respond to every single scientific study or comment.'" *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012) (discussing USFS's failure to respond to "four comments submitted by Dr. Chad Hanson in response to the initial EA") (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009)). *See also Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) ("We are not to act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty.") (internal quotation marks and citation omitted); *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*

---

[21] In addition, "[h]azard tree reduction activities on road 24S03 from it[s] northern Junction of FS Road 24S 16, south to its junction with FS Road 24S35 will not be completed until after July 30th. This timing may be adjusted if field survey conducted by field crews show that young are off the nest and capable of flight." BR 166.

*v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014) ("Therefore, we hold that, despite the fact that the BLM did not recite its reasons for relying on the studies cited in the EA as opposed to the studies cited by the comment, the BLM still performed the 'hard look' required by NEPA.").

The USFS took a hard look at Bull Run's potential effects on CSO and determined that the potential effects on the species were insignificant. The USFS "consider[ed] the proper factors and ma[de] a factual determination on whether the impacts are significant or not," a decision that "implicates substantial agency expertise and is entitled to deference." *Alaska Ctr.*, 189 F.3d at 859.

## V. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's request to amend the Complaint is **GRANTED**;

2. Plaintiffs' motion for summary judgment is **DENIED**;

3. Defendant's motion for summary judgment is **GRANTED**;

4. Defendant-Intervenor's motion for summary judgment is **GRANTED**;

5. Plaintiffs' request for expedited consideration is **DENIED AS MOOT**.

IT IS SO ORDERED.

Dated:  __**July 9, 2018**__                    _____**/s/ Lawrence J. O'Neill**_____
                                                    UNITED STATES CHIEF DISTRICT JUDGE